## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**WALTER R. HEPP, M.D.,**

        **Plaintiff,**

**vs.**                                              **CASE NO. 8:13-cv-02836-EAK-TBM**

**THE PAUL REVERE LIFE INSURANCE
COMPANY, PROVIDENT LIFE AND
ACCIDENT INSURANCE COMPANY,
and THE UNUM GROUP,**

        **Defendants.**

_____/

### PLAINTIFF'S RESPONSE AND OPPOSITION TO
### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Dr. Walter R. Hepp, M.D. (hereinafter "Dr. Hepp" or "Plaintiff"), by and through his undersigned counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, files this Response and Opposition to Defendants' Motion for Summary Judgment.

The undisputed facts in the record establish a breach of contract and fiduciary duty by Defendants.  Further, the record establishes a scheme to defraud by Defendants that is sufficient to support claims of fraud and RICO.  Thus, Defendants' motion for summary judgment must be denied on all grounds.

**A.**        **Breach of Contract**

Defendants assert that it is entitled to summary judgment on breach of contract because "Plaintiff's interpretation of the 'total disability' provisions is unreasonable and contrary to law."[1]  Defendants argue that Dr. Hepp's inability to perform invasive electrophysiological procedures is an inability to perform only *one or more* of his important duties and thus Dr. Hepp

---

[1] *Defendants' Motion for SJ, p.4; Dkt # 149.*

is only *residually* disabled as opposed to totally disabled.   However, a Cardiologist goes to further schooling to ***become*** board certified in Clinical Cardiac Electrophysiology so that they can perform invasive electrophysiological procedures.   Once you take away the ability to perform invasive electrophysiological procedures, the occupation reverts back to a Cardiologist.

Accordingly, since an Electrophysiologist must perform invasive electrophysiological procedures to be considered an Electrophysiologist, invasive electrophysiological procedures are the important and material duties of such occupation because when you take such duties away the occupation **ceases to exist**.   Dr. Hepp may have extensive experience in electrophysiology, but as a result of his inability to perform invasive electrophysiological procedures, he has lost hospital privileges, his Board Certifications, he has reduced his malpractice to cover himself as a non-invasive cardiologist, and he is no longer an Electrophysiologist.

> The materiality of a given occupational duty depends upon the importance of that duty to the claimant's professional endeavors, measured as a combination of the amount of time the activity consumes <u>and its qualitative importance to the professional mission. A duty is "material" when it is sufficiently significant in either a qualitative of quantitative sense that an inability to perform it means that one is no longer practicing the "regular occupation."</u>

*Smith v. Reliance Standard Life Ins. Co.*, 350 F. Supp. 2d 993, 1000 (S.D. Fla. 2004) (emphasis added).

### a.   Defendants' Legal Argument is Inapplicable to Florida Law and the Facts of this Case.

It is improper for Defendants to rely upon case law from other states when Defendants' own claims manual has noted that trial court determinations are factually unique and Florida law is much different than other states.[2]   This claims manual excerpt states that "Certain state or federal courts have interpreted the term 'occupation' in prior disability cases.  Each such holding

---

[2] Defendants' Claims manual Excerpt, **Exhibit "A"**.

is based on the unique facts of the case. **Florida, however appears to have adopted a more narrow definition of 'own occupation.'**" (emphasis added).[3]

Defendants' claims manual also specifically cited to the seminal Florida Supreme Court own occupation insurance policy case of *Berkshire Life Ins. Co. v. Adelberg*, 698 So.2d 828, (Fla. 1997)[4] cited to by Dr. Hepp in his motion for summary judgment and by this Court in its Order on Motions For Summary Judgment in *Natarajan v. Paul Revere Life Ins. Co.*, 720 F. Supp. 2d 1321, Case 8:04-cv-02612-EAK-TGW (M.D. Fla. 2010).[5] *Berkshire* requires this Court to construe an insurance policy "liberally in favor of the insured and strictly against the insurer." *Id* at 830. Additionally, *Berkshire* requires that in the "own occupation" disability policy context, "**your occupation" is to be given the meaning that an average buyer of an insurance policy would give to the term**. *Id.* (emphasis added).

The fact that Defendants' own claims manual recognizes that Florida law requires a more strict interpretation of occupation in favor of Dr. Hepp evidences intent and malice, especially when the facts make it clear that Defendants should not be predominately using CPT codes to determine occupation of medical specialists and this Court has previously found such actions to be a plausible RICO scheme.[6]

The majority of cases cited by Defendants regarding determinations of own occupation do not warrant much attention as they were cited to by Defendants in *Natarajan* and are from other states and jurisdictions which have different laws than Florida and each was fact specific.

---

[3] Defendants' Claims manual excerpt concerning Florida, **Exhibit "A"**.
[4] Defendants' Claims manual excerpt concerning *Berkshire*, **Exhibit "B"**.
[5] Dr. Hepp encourages the Court to review such Order as *Natarajan* and the instant case are factually similar with the same claims and many of the same arguments made by Defendants in this case were made in *Natarajan*. The primary difference in the instant case is that Dr. Hepp was able to obtain more evidence of Defendants' fraudulent scheme to present to the Court.
[6] Order on Defendants' Motion to Dismiss Complaint, page 6, Dkt. 27 citing *Natarajan v. Paul Revere Life Ins. Co.*, 720 F. Supp. 2d 1321, Case 8:04-cv-02612-EAK-TGW (M.D. Fla. 2010).

Essentially Defendants cite a litany of cases wherein it has persuaded courts in other states, based upon the factual circumstances of that individual case, that Defendants' fraudulent use of CPT codes was appropriate. No case that Dr. Hepp has ever seen in the entire country has propounded the overwhelming evidence provided today to this Court by Dr. Hepp. No Court except this one (in *Natarajan* and in *Hepp*) has ever been asked and analyzed the question of whether Defendants use of CPT codes is part of a larger fraudulent scheme to deny claims. As the Court has no doubt seen by the docket, it has been a long and protracted battle for disclosure of most of the documents Dr. Hepp cites in the respective summary judgment motions.[7]

Dr. Hepp would like to comment on the one Florida case cited by Defendants of *Socas v. Northwestern Mut. Life Ins. Co.*, 829 F. Supp.2d 1262 (S.D. Fla. 2011). This case, which concerns an own occupation determination with slightly different language than the contracts at issue in this case, is factually distinguishable in two primary ways. First, the plaintiff in S*ocas* was a general dentist both <u>before and after</u> her disability. This point is critical; Socas was not a board certified specialist and the case notes she testified that she was only partially disabled from being a general dentist after disability. Unlike the instant case, there was no assertion that a change in occupation occurred. Second, the plaintiff made no assertions, argument or proffered evidence concerning the impropriety of any billing and procedure analysis utilized by the insurer.

Here, Defendants admitted that prior to disability Dr. Hepp was a board certified Electrophysiologist. It is undisputed that a board certified Electrophysiologist must perform invasive electrophysiological procedures, and that the primary EP procedures are EP studies and Ablations. After disability, Dr. Hepp was unable to perform any invasive electrophysiological

---

[7] This discovery battle to force Defendants to disclose relevant documents unfortunately is not over as Dr. Hepp will be forced to file renewed motions for sanctions to compel Defendants to turn over documents it was ordered to but never did.

procedures, his board certifications and hospital privileges lapsed, and he reverted to the occupation of Cardiologist. Dr. Hepp was thus a specialist before disability and not a specialist after disability.

If Defendants' fraudulent contractual interpretations were correct, no surgeon would ever qualify for total disability because all surgeons are required to see patients before and after surgery. Defendants' fraudulent interpretation cannot be permitted when Defendants specifically marketed and sold the policy to surgeons to protect them if they no longer could perform surgery.[8]

## With 337 protection:

- **You're considered totally disabled if you cannot perform the duties of your occupation.** You don't have to take a job paying you less to support your standard of living. If you're a surgeon and can no longer operate, Provident will consider you disabled—regardless of how much you can make teaching or in another profession. That definition of disability can be yours up to age 65 . . . even longer in some cases.

Dr. Hepp was undisputably an Electrophysiologist prior to his injury and a mere Cardiologist after his injury. Because of his disability, Dr. Hepp can no longer perform Electrophysiologic ("EP") Studies and Ablations, which were the cornerstones of his specialty and practice. Defendants based their occupational determination solely or predominately on a CPT code analysis that merely separated invasive CPT codes from non-invasive CPT codes.

Defendants conveniently ignored the fact that prior to his disability, Dr. Hepp was performing *above* the national average for EP procedures as mandated by the American College of Cardiology for Electrophysiology competence, and that in 2010, Dr. Hepp was performing

---

[8] *Provident Marketing Materials for Plaintiff's policy produced by Defendant at 337MARKET-000122,* **Exhibit "C".**

approximately the same amount of EP procedures as the other two leading Electrophysiologists in Sarasota.[9]  Defendants' claim manual provided that Defendants were required to determine occupation using "a broader description of the type of work as is generally performed in the national economy."[10] Defendants made no analysis or even thought about the fact that Dr. Hepp performed more than the national average number of procedures for an Electrophysiologist.

Defendants' argument that Dr. Hepp had "overwhelming continuity" based on *Socas* is clearly not supported by the facts in this case.  Defendants admit that Plaintiff was a board certified Electrophysiologist in May 2011, the time of his injury. [11] Defendants admitted their own internal vocational consultant and a medical expert found that Dr. Hepp's practice and inclusive cardiology duties were "well within the general expectations of the EP practice."[12] Rule 36 of the Federal Rules of Civil Procedure states that a matter admitted is conclusively established.

Post-disability, Dr. Hepp no longer performs any EP procedures, has no privileges to perform EP procedures, has lost his board certifications in EP that he obtained in 1994, and now practices as a mere Cardiologist.[13]  It cannot be disputed that Cardiology and Electrophysiology are different occupations because Defendants admit that a Cardiologist goes to additional schooling to **become** an Electrophysiologist.[14] Just as a caterpillar *becomes* a butterfly, a Cardiologist *becomes* an Electrophysiologist when they graduate their EP Fellowship and become board certified.   As long as an Electrophysiologist performs enough invasive electrophysiological procedures to maintain competency and privileges, that person is an

---

[9] Declaration of Dr. Hepp, ¶ 6, **Exhibit "D"**.
[10] Defendants' Claims manual excerpt concerning Florida, page 2, **Exhibit "A"**.
[11] *Defendants' Admissions, #35,* **Exhibit "E"**.
[12] *Defendants' Admissions, #9,* **Exhibit "E"**.
[13] Declaration of Dr. Hepp, ¶ 8, **Exhibit "D"**.
[14] *Defendants' Admissions, #38,* **Exhibit "E"**.

Electrophysiologist.  If you lose the ability to perform EP procedures, you can no longer practice Electrophysiology and revert back to Cardiology.  Accordingly, a "before and after" comparison of Dr. Hepp's pre- and post-disability duties clearly does not show any continuity, let alone overwhelming continuity.

      **b.**      **Dr. Hepp's Duties**

Defendants' occupational analysis of Dr. Hepp's duties in the disability claim was based either solely or predominately on their use of a CPT code analysis.  In this litigation, Defendants seek to justify its CPT code analysis *after the fact* by completely taking out of context and mischaracterizing statements made in depositions and in claim forms completed by Dr. Hepp.

In their argument for "overwhelming continuity," Defendants quote Dr. Mollod, one of Dr. Hepp's managing partners.  In their Motion for Summary Judgment at page 9, Defendants quote Dr. Mollod to imply that nothing changed in Dr. Hepp's practice after disability "except for the procedures."  Dr. Mollod's inartful and quick answer did not capture the enormity of what an inability to perform procedures entailed.  This is why Dr. Mollod submitted an errata sheet (which Defendants did not mention or provide to the Court) that clarifies Dr. Mollod's answer to Defendants' question of what changed in Dr. Hepp's practice before and after disability:[15]

> Before injury he was an invasive cardiac Electrophysiologist and after he was a cardiologist.

Dr. Hepp also explains that before disability he saw arrhythmia patients almost exclusively, diagnosed them, and then performed EP Studies and ablations on those patients whom he thought required them.[16]  Dr. Hepp would then after surgery maintain care of such

---

[15] Depo Mollod Errata Sheet, **Exhibit "F"**.
[16] Declaration of Dr. Hepp, ¶ 2, **Exhibit "D"**.

patients as needed.[17]   After disability, since Dr. Hepp could no longer perform invasive electrophysiological procedures, he was not qualified to diagnose and determine what invasive electrophysiological procedures were required.[18]

Dr. Hepp as a Cardiologist now sees new patients with all manner of heart related issues, and if arrhythmia indicators are present, the patient is referred to an Electrophysiologist.[19]  Dr. Hepp's practice has radically changed and he no longer obtains referrals for Electrophysiology.[20] Since an Electrophysiologist makes far more money than a cardiologist[21], Dr. Hepp has had to work more hours and see more patients yet now makes far less money than he did as an Electrophysiologist.[22]

Defendants at page 7 of its motion also take an off the cuff response out of context from Dr. Schreibman, Dr. Hepp's other managing partner of Heart Specialists of Sarasota.  Dr. Schreibman used the word "microscopic" when comparing EP lab time to office time.  However, just a few minutes later, Dr. Schreibman clarified that Dr. Hepp's block of Friday time was in fact **a 17 hour day**:[23]

> He always had one, I believe, large day of procedures, and the other days he was seeing patients who were then set up for procedures…[h]e would, from what I recall, sometimes start a 7:00 in the morning before he joined us, and he would be done at 1:00 in the morning and work sometimes, you know, extraordinarily long days on his Fridays.

Dr. Schreibman also noted an Electrophysiologist is required to perform invasive electrophysiological procedures to be an Electrophysiologist:

---

[17] *Id*.
[18] *Id*.
[19] *Id*.
[20] Declaration of Dr. Hepp, ¶ 10, **Exhibit "D"**.
[21] Depo Dr. Schreibman, p.34, **Exhibit "G"** (noting that Interventionalists make more money than non-invasive doctors); see also Declaration of Dr. Hepp, ¶ 10, **Exhibit "D"**.
[22] Declaration of Dr. Hepp, ¶ 10, **Exhibit "D"**.
[23] Depo Dr. Schreibman, page 10-11, **Exhibit "G"**.

> An Electrophysiologist who doesn't do invasive procedures is not an Electrophysiologist…I would never hire an Electrophysiologist that didn't perform procedures.  It's not part of the field. [24]

Defendants' argument that the fact Dr. Hepp was not performing certain procedures prior to his disability is also a mischaracterization.  Defendants argue that newer EP procedures such as VT ablations and A-fib ablations were not being performed by Dr. Hepp and therefore, he was not a "full-fledged" Electrophysiologist.  Dr. Schreibman explains:[25]

> Walter Hepp was a classical Electrophysiologist who performed the interventional electrophysiology procedures of his era and just different…Dr. Hepp did the full spectrum during—of what was appropriate during his training era.

Dr. Schreibman further elaborates on Dr. Hepp's procedures:[26]

> Q.    Does Dr. Hepp presently do anything that falls under the realm of electrophysiology?
> A.    I would say the answer is an unequivocal no.
> Q.    And that's because with respect to what Dr. Hepp was doing, his realm of EP, what was Limited EP, was just the ablations and the EP studies?
> A.    Exactly.  That's really what an Electrophysiologist does in 2015.

Defendants also argue that since a majority of EP patients do not need invasive EP procedures, the EP procedures are not the important and material duties of the occupation.  Defendants' argument is illogical as it ignores the fact that the Electrophysiologist sees a patient and performs non-invasive diagnostic testing to determine what, if any, EP procedures are required.  Defendants are attempting to create their own standard as to what qualifies someone as an Electrophysiologist that is contrary to what every medical specialist witness in this case, including Defendants' internal Cardiologist, has testified to.

Dr. Charles D. Gottlieb, M.D., Plaintiff's expert Electrophysiologist, testified that he considered himself an Electrophysiologist once he completed his fellowship and even before he

---

[24] Depo Dr. Schreibman, page 9, **Exhibit "G".**
[25] Depo Dr. Schreibman, page 25, **Exhibit "G".**
[26] Depo Dr. Schreibman, page 40-41, **Exhibit "G".**

was board certified.[27] From a plain reading of Dr. Gottlieb's explanation, the *number* of procedures performed by an Electrophysiologist is not indicative of whether one is an Electrophysiologist because according to Dr. Gottlieb you are considered an Electrophysiologist when you complete the additional training and become an Electrophysiologist.  This is akin to a judge, who becomes a judge and considers themselves a judge the day they are sworn in, not based upon the numbers of cases they have adjudicated over the years.

Defendants' expert Electrophysiologist, Dr. Hanscy Seide, states on page one of his report dated March 2015 that he has been a clinical interventional cardiac Electrophysiologist for "close to 13 years."[28]  13 years ago was 2002, and on page one of Dr. Seide's resume it states that Dr. Seide started his Electrophysiological fellowship in 2002.[29]  Defendants' expert Electrophysiologist thus considered himself an Electrophysiologist *before* he even completed his training and long before he became board certified in Electrophysiology in 2008.[30]  Dr. Seide failed his EP board certification test the first two times he took it, yet notwithstanding considered himself an Electrophysiologist the entire time he was not board certified.[31]

As noted by Dr. Schreibman, one cannot be an Electrophysiologist unless they perform invasive electrophysiological procedures. This is supported by the entire medical community as well as Defendants' own expert.  It is undisputed that Dr. Hepp was a board certified Electrophysiologist before disability because Defendants admitted to this fact.  Dr. Hepp can no longer perform invasive electrophysiological procedures, and has lost his privileges and board certifications in electrophysiology.  Therefore, Dr. Hepp is no longer an Electrophysiologist.  Dr.

---

[27] Depo Gottlieb, p.9, **Exhibit "H"**.
[28] Seide Report, p.1, **Exhibit "I"**.
[29] *Id*. at p. 8.
[30] Dr. Seide's EP Board Certification date of 2008 is in his resume which is at page 9 of his report, **Exhibit "I"**.  Dr. Seide failed his EP board certification test the first two times, yet notwithstanding considered himself an Electrophysiologist due to his additional training. Depo Seide, p.38, **Exhibit "J"**.
[31] Depo Seide, p.38, **Exhibit "J"**.

Hepp has conclusively established that he is unable to perform the important duties of his occupation and is therefore totally disabled.

### c.      The Dual Specialty Letter

Defendants referenced in its facts at page 6 and in its motion a "dual specialty letter" allegedly drafted on August 13, 1992.  Dr. Hepp never received or saw this letter as it was purportedly sent to Defendants' agent and employee, Beverly Camp, not Dr. Hepp. [32]   The first time Dr. Hepp saw this letter was in 2011, when he requested a copy of his claims file from Unum.[33] Defendants also admit Dr. Hepp never received or saw such in a letter to the Florida Department of Financial Services.[34]

Defendants notably did <u>not</u> state in their Statement of Undisputed Facts that they **<u>sent</u>** this 1992 letter to Dr. Hepp.  In fact, Defendants' Statement of Undisputed Facts states at page 6 the letter was sent instead to its agent and employee, Beverly Camp.  Ms. Camp, however, has no recollection of receiving such letter or of providing it to Dr. Hepp, and certainly does not believe it was sent to Dr. Hepp.[35]   In their pleadings, Defendants *insinuate* that they sent Dr. Hepp this letter merely because it is addressed to him at the top of the page.  Defendants know they did not send such dual specialty letter to Dr. Hepp and thus never actually allege that they did; Defendants instead cagily yet deceptively state in its motion at page 19 the letter was "issued" and "written" to give the Court the impression it was *sent* to Dr. Hepp when it was not.[36]

---

[32] Declaration of Dr. Hepp, ¶ 19, **Exhibit "D"**.
[33] Declaration of Dr. Hepp, ¶ 19, **Exhibit "D"**.
[34] Letter from Defendants to FDFS, **Exhibit "K"**.
[35] Declaration of Beverly Camp, ¶ 6-7, **Exhibit "L"**.
[36] Declaration of Dr. Hepp, ¶ 19, **Exhibit "D"**.

This dual specialty letter is also immaterial.  First, it cannot change the contract, which defines occupation as the occupation at the time of disability.[37]  The letter was purportedly "written" before board certifications existed for Electrophysiology and Dr. Hepp became board certified as a Clinical Cardiac Electrophysiologist two years later in 1994.[38]  The letter was also dated long before the Florida Supreme Court case of *Berkshire v. Adelberg* held that insurance contracts must be interpreted against an insurance company to provide the most coverage and thus the letter is in conflict with the law.

### d.    Defendants' Use of CPT Codes

Defendants try to steer the topic of their use of CPT codes to solely a RICO issue, but it is very much an issue for Plaintiff's Breach of Contract allegation as well.  Dr. Hepp's Statement of Disputed Facts outlines that Defendants were sanctioned by the State of California for predominately using CPT codes to classify medical specialists out of their occupation.[39]  Defendants thereafter have admitted at a 30(b)(6) deposition that such practices involving CPT codes should not be taking place in all states and in all claims.[40]  Defendants even attach the California Settlement Agreement to its annual report to the present.[41]

Internally, Defendants recognize that CPT codes cannot correlate pre- and post-op office visits with related surgical procedures, are not precise for anything but billing, and do not distinguish important or material and substantial duties.[42]  Notwithstanding, Defendants proceeded forward with its CPT code analysis and in a letter dated March 9, 2012, Defendants

---

[37] Defendants' counsel admitted during a deposition on the record that such letter did not alter the policy terms. Doud Depo p. 257-260, **Exhibit "P"**.
[38] Declaration of Dr. Hepp, ¶ 18, **Exhibit "D"**.
[39] *CA Market Conduct Examination, p. 15-16;* **Exhibit "M"**, *CA Market Conduct Accusation, p. 8-9;* **Exhibit "N"**,
[39] *CA Market Conduct Decision and Order;* **Exhibit "O"**.
[40] *Rule 30(b)(6) depo of Laura Kilmartin, p. 46-53,* **Exhibit "Q"**.
[41] Unum 2014 10-K, page 186, **Exhibit "R"**.
[42] *Defendants' Admissions #23-27,* **Exhibit "E"**; *see also CPT Memo Bates # 6570-6572,* **Exhibit "S"**.

advised Dr. Hepp it denied Plaintiff total disability based upon a determination of his important/substantial and material duties **derived from Defendants' CPT code analysis**:[43]

When Dr. Hepp appealed Defendants' decision, Defendants were told explicitly not to use the same CPT code analysis, yet did it anyway.[44] The facts establish that Dr. Hepp was an Electrophysiologist before disability and after disability was not an Electrophysiologist but a Cardiologist.

## B.    Breach of Fiduciary Duties

It is undisputed that Defendant Unum is an insurance holding company who administers claims on behalf of Defendant insurers Paul Revere and Provident.[45] There is no evidence or suggestion in the record that Defendant The Unum Group is an insurer and Defendants have told this Court it is not.  Dr. Hepp paid his premiums to Unum each year.[46] Unum was entrusted with the management of Dr. Hepp's premiums as well as to adjust his claim for disability.[47] This Court has previously held that a claim of breach of fiduciary duty by an insurance holding company is lawful and Dr. Hepp's allegations state a plausible cause of action that a fiduciary relationship was created and that damages resulted from breach of that fiduciary duty.[48]

In *Traditions Senior Management, Inc. v. United Health Administrators, Inc.*, 2013 WL 3285419 (M.D. Fla. June 27, 2013), the court also held that United Health Administrators, Inc., which had several affiliated insurance companies under its umbrella, was in a fiduciary relationship with the insured.  The court stated that the defendant and "his affiliated companies would act as trustee for premium payments...one who is entrusted with the management of

---

[43] *Letter from Defendants to Plaintiff dated 3/9/12, Claim File Bates # 2980-2990,* **Exhibit "T"**.
[44] *Letter dated 12/14/12 denying appeal, Claim File Bates # 3110-3116,* **Exhibit "U"**.
[45] Defendants' MSJ, Dkt.149, p.2; Defendants' Answer, Dkt. 28, ¶ 9, 12.
[46] Declaration of Dr. Hepp, ¶ 24, **Exhibit "D"**.
[47] *Id.*
[48] Order on Defendants' Motion to Dismiss Complaint, page 11, Dkt. 27.

another's money owes a fiduciary duty to that person." *Id.* at 3.  The court further stated that the plaintiff's allegations that the defendants acted as trustees for its payments and then failed to pay out claims was "...a plausible cause of action that a fiduciary relationship was created and that damages resulted from breach of that fiduciary duty." *Id.*

Similarly, in this case, Plaintiff paid his premiums to Defendant Unum Group who acted as the holding company to its insurer subsidiaries.  Defendants as a holding company was entrusted with the management of Plaintiff's premiums and thus owed a fiduciary duty to Plaintiff.

**C.      Breach of Covenant of Good Faith and Fair Dealing**

Plaintiff is unclear why Defendants moved for summary judgment on an abated claim. Until a breach of contract has been established, no argument surrounding this allegation is warranted as it is abated.

**D.      Plaintiff's RICO Claims**

The four elements of a RICO claim are: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity.[49] These elements have been developed by a number of courts to mean, "[a] RICO enterprise exists where a group of persons associates, formally or informally, with the purpose of conducting illegal activity."[50] "A successful 'pattern of racketeering activity' charges that '(1) the defendants committed two or more predicate acts within a ten year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a continuing nature."[51]

---

[49] Order on Defendants' Motion to Dismiss Complaint, page 4, Dkt. 27.
[50] *Id.*
[51] *Id.* at page 5.

In the instant case, Dr. Hepp provides evidence that Provident switched from claims payment to claims management and decided to deny claims to make money. Provident started to make money from its claims denials and thereafter acquired Paul Revere to form Provident Companies. Provident Companies then merged with Unum and Unum adopted the fraudulent scheme to deny claims to make money. Defendants have since targeted high indemnity own occupation claims like Dr. Hepp's for denial.

For disability claims by medical specialists, Defendants utilize a CPT code analysis to classify that medical specialist out of their occupation in order to deny total disability. Defendants employed this scheme against Dr. Natarajan and Dr. Hepp, and testimony from Defendants' appeal specialist, Melissa Walsh, established that Defendants utilize this scheme on **all** claims by medical specialists and will continue to do so in the future. Defendants then pocket the reserve on such denied claims and use it to run their business and provide incentive compensation to its employees.

This Court has found the above described scheme to be a plausible RICO scheme both in this case and in the *Natarajan* case, and it clearly articulates a pattern of racketeering activity with related predicate acts which demonstrate criminal conduct of a continuing nature.

### a.    The Predicate Acts Are Related To Each Other And Are Fraudulent

The predicate acts of mail and wire fraud include letters from Defendants to Dr. Hepp and others both asking for CPT codes "to determine duties" and conveying the fraudulent results of the CPT code analysis as a basis to deny claims (fraudulently omitting Defendants' knowledge that the CPT codes were being used improperly used to deny claims).[52] Unum also used the mail

---

[52] Composite **Exhibit "V"**, letters dated 7/26/11 to Vale, Letter dated 7-26-11 to Cole, letter 7-26-11 to Dr. Hepp, email regarding CPT code dated 8/2/11, letter to Dr. Hepp dated 8/30/11, letter to Vale dated 9-28-11, letter to Cole

<span style="text-align:right">(continued)</span>

to send Dr. Hepp an invoice for premiums each year from 1992 to the present as well as to receive Dr. Hepp's check and payment of premiums each year.[53]

Dr. Hepp has provided this Court with ample evidence that Defendants knew it should not use CPT codes to classify medical specialists out of their occupation and that CPT codes do not distinguish important and material duties yet Defendants used CPT codes for that very purpose in this case. Defendants' pattern of racketeering activity includes perpetuating the same fraud on Dr. Natarajan as well as Dr. Hepp and every other medical specialist who files for disability.

Defendants' use of CPT codes, however, is merely a vehicle for Defendants' larger fraudulent scheme to deny claims in order to make money. The fraudulent scheme includes linking Defendants' profit to incentive compensation for employees who participate in the scheme. Dr. Hepp has provided this Court with overwhelming evidence that Defendants had motive to deny claims due to underperformance in the Closed Block when Dr. Hepp's claim and appeal were denied.

Dr. Hepp has also provided clear evidence that Defendants incentivize its employees to meet business targets and increase profitability in the Closed Block and if the Closed Block does not close enough claims then incentive compensation is reduced. One method that Defendants use to deny claims of medical specialists is to use CPT codes to classify them out of their specialist occupation so that such person would not be totally disabled.

---

dated 9-28-11, email sending CPT codes to Defendants dated 9/29/11, letter to Florida Dept. Financial Services dated 10/31/11, denial letter dated 3/9/12, denial of appeal letter dated 12/14/12.
[53] Declaration of Dr. Hepp, ¶ 24, **Exhibit "D"**.

### b.      Plaintiff's Injury

This Court has previously held that Plaintiff need only show that he was injured by virtue of the pattern of Defendants' racketeering activity.[54]   The Court cited *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495, 105 S. Ct. 3275, 3284, 87 L. Ed. 2d 346 (1985), which stated:

> If the defendant engages in a pattern of racketeering activity in a manner forbidden by these provisions, and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under § 1964(c). There is no room in the statutory language for an additional, amorphous "racketeering injury" requirement.

In this case, Dr. Hepp has shown that he relied on representation about the policies and was not informed when Defendants switched to a claims management approach intended to deny claims if possible.   Dr. Hepp was not informed that Defendants would use a CPT code analysis to fraudulently classify him out of his occupation to deny his claim for total disability.   Defendants have engaged in a clear pattern of fraud and as a result Dr. Hepp's claim has been denied through use of this fraudulent CPT code analysis, depriving Dr. Hepp of millions of dollars in benefits. Dr. Hepp has therefore been injured as a result of Defendants' racketeering activity.

### c.      The Distinct Enterprise

Defendants admit Defendant Unum is a holding company for insurers Paul Revere and Provident.[55] Defendants make clear in its Motion for summary judgment that "Unum Group, Paul Revere, and Provident are distinct corporate entities..."[56]   While Paul Revere is a wholly owned subsidiary of Unum Group, it does not appear that Provident is wholly owned by Unum Group.   According to a 2005 State of Tennessee report on Provident, Unum Group only owns

---

[54] Order on Motion to Dismiss, Dkt. 27, p.7-8.
[55] Defendants' Motion for Summary Judgment, Dkt. 149, p.2
[56] Id. at p. 20.

85.9% of Provident, with 10.1% and 4.0% of Provident owned by Paul Revere and Unum America.[57] In its 2015 annual report, Defendants lists over 25 different companies in various states and countries that it provides claims services to.[58]

Unum not only handles claim investigation and denial for its wholly owned subsidiaries, it has entered into a general services agreement whereby it handles all claim administration, investigation and denials for Provident.[59]   Further, Unum handles claim administration and denials for competitors and companies that it has no ownership in.   The Maryland Insurance Administration in 2007 conducted a market conduct exam of John Hancock Life Insurance Company and notes that since 1992 Unum has administered all claims for such company.[60]

The RICO enterprise alleged is not solely the Defendants', but Defendants' and all of its subsidiaries and common claims handling units wherein Unum administers claims in a common fashion for a multitude of these separate legal entities.   The 11th Circuit supports Dr. Hepp's argument:

> Initially, we recognize that a defendant can clearly be a person under the statute and also be *part* of the enterprise. The prohibition against the unity of person and enterprise applies only when the singular person or entity is defined as both the person and the only entity comprising the enterprise.

*United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000).

The Supreme Court of the United States has held that separate legal entities are distinct for RICO purposes.   In *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001), the plaintiff sued defendant Don King for RICO violations, claiming that he had conducted the affairs of Don King Productions through a pattern of racketeering.   Don King Productions was a closely-held corporation, of which King was the sole shareholder as well as an employee.   *Id.*

---

[57] 2005 State of Tennessee report on Provident, p.9, **Exhibit "W"**.
[58] Unum Subsidiary Report, **Exhibit "X"**.
[59] Provident General Services Agreement, **Exhibit "Y"**.
[60] Maryland Market Conduct Exam of John Hancock, p.6, **Exhibit "Z"**.

The court ultimately held that a closely-held corporation and its sole shareholder were separate entities, and thus distinct for purposes of RICO.  The court held that:

> Linguistically speaking, an employee who conducts the affairs of a corporation through illegal acts comes within the terms of a statute that forbids any "person" unlawfully to conduct an "enterprise," particularly when the statute explicitly defines "person" to include "any individual...capable of holding a legal or beneficial interest in the property," and defines "enterprise" to include a "corporation."  **And, linguistically speaking, the employee and the corporation are different "persons," even where the employee is the corporation's sole owner."**

*Id.* at 163 (emphasis added).  Just as in *Goldin and Cedric Kushner Promotions, Ltd.*, Plaintiff has alleged an enterprise of separate and distinct entities incorporated and doing business in different states, with Defendants guiding and controlling fraudulent claims practices for all of these separate legal entities with a common purpose of handling claims profitably by denying valid claims.

## E.      Fraud

Defendants materially misrepresented the nature and quality of the policies sold to Dr. Hepp as well as its intent and willingness to evaluate claims on such policies objectively and pay benefits pursuant to the terms.  Dr. Hepp has provided this Court with extensive evidence and details in his statement of disputed facts that clearly show the establishment of a fraudulent scheme to deny claims that continues to the present.  Dr. Hepp also provided substantial facts that show Defendants knew it should not be predominately using CPT codes to classify medical specialists out of their occupation yet did so anyway.   Dr. Hepp has satisfied the pleading requirements and has specifically stated what statements were made, by whom, on what date, and the effect of the fraudulent statements and omissions.

The United States Supreme Court has ruled that "to survive a motion to dismiss, a complaint must now contain factual allegations which are 'enough to raise a right to relief above

the speculative level, on the assumption that all the allegations in the complaint are true.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965, 167 L.Ed.2d 929, as quoted in *Berry v. Budget Rent A Car Systems, Inc.*, 497 F.Supp. 2d 1361, 1364 (S.D. Fla. 2007).  Here, Dr. Hepp set forth sufficient allegations to put Defendants on notice of the facts upon which his claims for relief are based.  This Court held that the substantially similar allegations in *Natarajan v. Paul Revere Life Ins. Co.,* 720 F. Supp. 2d 1321, were also sufficiently pled and survived Defendants' motion for summary judgment.

Plaintiff's claims are also not barred by Florida's statute of repose for fraud actions. Every year Plaintiff paid premiums on his policies.  Each year when Dr. Hepp was sent an invoice and paid his premiums, Defendants fraudulently omitted its intent to deny Dr. Hepp's policy and use CPT codes to classify him out of his medical specialty. Each year Defendants failed to inform Plaintiff that it would target his claim for denial and use a CPT code review as the sole basis to classify him out of his specialty.

Defendants' continual omissions every year form a continuing fraud to the present. "Under the continuing torts doctrine, the statute of limitations runs from the date that the tortious conduct ceases." *Laney v. Am. Equity Inv. Life Ins. Co.*, 243 F. Supp. 2d 1347, 1357 (M.D. Fla. 2003).  Further, Dr. Hepp has shown that fraudulent omissions have occurred in each year within the past 12 years and that he relied upon such fraud.

F.      **Fraud Regarding ERISA**

When Defendants denied Dr. Hepp's claim for total disability, they informed him that he was required to appeal his claim internally pursuant to ERISA and if he did not appeal he could not begin any legal action:[61]

> If you dispute this determination, you have the right to bring a civil action under section 502(a) of the Employee Retirement Income Security Act following an adverse benefit determination on review. Unless there are special circumstances, this administrative appeal process must be completed before you begin any legal action regarding your claim.

Defendants also misled Dr. Hepp into thinking he had to file an action under section 502(a) of ERISA. ERISA clearly does not apply to Dr. Hepp's policies as they are individual and not part of any group plan. Defendants' statements were fraudulent and intended to delay Dr. Hepp's filing of litigation and trick Dr. Hepp into a fraudulent appeal and bring any subsequent litigation under ERISA. Defendants seek to mislead insureds into filing under ERISA because it would then limit damages. Dr. Hepp acted in reliance of Defendants' false statements and agreed to an internal appeal, delaying this litigation and justice. Dr. Hepp was also forced to pay another year of premiums during this appeal.

After the appeal was denied, Defendants again sent Dr. Hepp a letter stating that his policy was likely governed by ERISA when it was not. Defendants stated:[62]

---

[61] Unum letter to Dr. Hepp denying claim dated March 9, 2012, **Exhibit "T"**.
[62] Unum letter to Dr. Hepp denying appeal dated December 14, 2012, **Exhibit "U"**.

**Next Steps Available to your client:**

The company's review with regard to Dr. Hepp's eligibility for Total Disability benefits is complete. If your client wishes to claim Residual Disability benefits, we request all information outlined in The Benefits Center's March 9, 2012 letter.  This information must be received within 30 days, or by January 14, 2012.

We have concluded policy # **0102559175** may be governed by ERISA.  Your client's rights under ERISA are as follows:

*Upon written request, you are entitled to receive, upon request and free of charge, reasonable access to, and copies of all documents, records and other information relevant to your client's claim for benefits.*

*If your client disagrees with this decision, you have a right to bring a civil suit under section 502(a) of the Employee Retirement Income Security Act of 1974.*

*Your client and their plan may have other voluntary alternative dispute resolution options, such as mediation.  One way to find out what may be available is to contact your local U.S. Department of Labor Office and your State insurance regulatory agency.*

Attorney Malone, if you have any questions, please contact me at 1-888-226-7959, extension 76710.

Sincerely,

*Melissa A Walsh*

Defendants knew that Dr. Hepp's policy was an individual policy and that ERISA did not apply yet purposefully asserted that ERISA applied in order to trick Plaintiff again into filing a claim under 502(a) of ERISA.

## CONCLUSION

For the reasons stated herein, Dr. Hepp respectfully requests the Court Deny Defendants' motion for summary judgment.

Dated June 18, 2015

SHUMAKER, LOOP & KENDRICK, LLP
Post Office Box 49948
Sarasota, Florida  34230-6948
(941) 366-6660
(941) 366-3999 (fax)
Attorneys for Dr. Hepp

By  */s/Jarrod J. Malone*
    Michael S. Taaffe

Fla. Bar No. 0490318
Jarrod J. Malone
Fla. Bar No. 0490490
mtaaffe@slk-law.com
jmalone@slk-law.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Kristina B. Pett, Esq.
Pett Furman, PL
2101 N.W. Corporate Blvd., Suite 316
Boca Raton, FL 33131-7319
kpett@pettfurman.com
mdeklyen@pettfurman.com
Attorney for Defendants

David E. Harvey, Esq.
Timon V. Sullivan, Esq.
Ogden & Sullivan, P.A.
113 South Armenia Avenue
Tampa, FL 33609-3307
dharvey@ogdensullivan.com
tsullivan@ogdensullivan.com
eservice@ogdensullivan.com
Attorneys for Defendants

Theona Zhordania, Esq.
Sheppard Mullin Richter & Hampton, LLP
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071-1422
tzhordania@sheppardmullin.com
Attorney *Pro Hac Vice* for Defendants

Jeffrey K. Rubin, Esq.
Friedman │ Rubin
51 University Street, Suite 201
Seattle, WA  98101
jrubin@friedmanrubin.com
Attorney *Pro Hac Vice* for Plaintiff

Anita Rosenthal, Esq.
Steven Dawson, Esq.
Dawson & Rosenthal, PC
25 Schnebly Hill Road
Sedona, AZ 86336
dandr@dawsonandrosenthal.com
viki@dawsonandrosenthal.com
Attorneys *Pro Hac Vice* for Plaintiff

this 18th day of June, 2015.

Shumaker, Loop & Kendrick, LLP
240 South Pineapple Avenue
Post Office Box 49948
Sarasota, Florida  34230-6948
(941)  366-6660
(941)  366-3999 (fax)
Counsel for Dr. Hepp

By_____*/s/Jarrod J. Malone*_____
            Michael S. Taaffe, Esq.
            Fla. Bar No. 0490318
            Jarrod J. Malone, Esq.
            Fla. Bar No. 0010595
            mtaaffe@slk-law.com
            jmalone@slk-law.com