## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### Tampa Division

WALTER R. HEPP, M.D.,

     Plaintiff,

vs.                              CASE NO. 8:13-cv-02836-EAK-TBM

THE PAUL REVERE LIFE INSURANCE
COMPANY, PROVIDENT LIFE AND
ACCIDENT INSURANCE COMPANY,
and THE UNUM GROUP,

     Defendants,

_____/

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

THIS CAUSE is before the Court on Plaintiff's Motion for Summary Judgment as to Count One and Defendants' Affirmative Defenses (Doc. 145), Defendants' Motion for Summary Judgment (Doc. 149), Defendants' Response in Opposition to Plaintiff's Motion for Summary Judgment as to Count One and Defendants' Affirmative Defenses (Doc. 153), and Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment (Doc. 154). For the reasons set forth below, Defendants' Motion for Summary Judgment (Doc. 149) is **DENIED** and Plaintiff's Motion for Summary Judgment (Doc. 145) is **GRANTED IN PART**, with respect to Defendants' Seventh, Eighth, Eleventh, Twelfth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth, and Twenty-First Defenses, and **DENIED IN PART** as to all other defenses and to Count One.

## PROCEDURAL HISTORY

Plaintiff filed this action on November 6, 2013, against The Paul Revere Life Insurance Company, The Unum Group, and Provident Life and Accident Insurance Company for failing to

1

pay total benefits on two long-term, own-occupation, professional disability insurance plans that Plaintiff had purchased to protect the income from his medical practice. (Doc. 1). In his Complaint (Doc. 1), Plaintiff alleges nine counts of misconduct by the Defendants. These include: (1) breach of contract, (2) violation of Chapter 624 of the Florida Statutes (bad faith), (3) breach of fiduciary duties, (4) breach of covenant of good faith and fair dealing, (5) violation of 18 U.S.C. § 1962 (a), a Federal RICO statute, (6) violation of 18 U.S.C. § 1962 (b), a Federal RICO statute, (7) violation of 18 U.S.C. § 1962 (c), a Federal RICO statute, (8) fraud as to statements and omissions regarding the nature and quality of Plaintiff's policy, and (9) fraud as to Plaintiff's occupational determination, CPT code analysis, and claims determinations.

On May 29, 2015, both Defendants (Doc. 149) and Plaintiff (Doc. 145) filed Motions for Summary Judgment. On the same day, Defendants filed a Statement of Undisputed Facts (Doc. 148), Plaintiff filed a Statement of Undisputed Facts (Doc. 146), and Defendants filed a Joint Statement of Undisputed Facts (Doc. 147) on behalf of both parties. On June 18, 2015, both Plaintiff (Doc. 154) and Defendants (Doc. 153) filed Responses in Opposition to the respective Motions for Summary Judgment. Additionally, Plaintiff (Doc. 155) and Defendants (Doc. 152) filed Statements of Disputed Facts on June 18, 2015.

On June 23, 2015, Defendants filed a Motion to Strike the Declarations of Beverly Camp (Doc. 158). Plaintiff filed a Response in Opposition to the Motion to Strike (Doc. 161) on June 25, 2015. Additionally, Defendants filed Motion to Seal Exhibits "SS" and "TT" (Doc. 162) on June 26, 2015. Plaintiff filed a Response in Opposition to the Motion to Seal (Doc. 163) on June 26, 2015. The Court denied both of the Defendants' Motions on July 2, 2015. (Doc. 164).

On July 14, 2015, Plaintiff filed a Motion to Take a Deposition of Jack McGarry. (Doc. 166). Defendants filed a Response in Opposition to the Motion to Take Deposition (Doc. 168) on

July 27, 2015. The Court denied Plaintiff's Motion for Leave to Depose Jack McGarry on July 28, 2015. (Doc. 171). Having decided these Motions, this Court can now decide Defendants' and Plaintiff's Cross-Motions for Summary Judgment. (Doc. 145); (Doc. 149).

## STATEMENT OF THE FACTS

The following facts are submitted by the parties in support and/or in opposition to their respective motions for summary judgment. The Court recognizes these as "facts" only in regard to the resolution of the pending motion.

Plaintiff, Walter R. Hepp, M.D., ("Dr. Hepp"), is a medical doctor operating primarily out of Sarasota in the State of Florida. (Doc. 1:2). Defendant The Unum Group ("Unum") is a Delaware corporation with its principal place of business in Tennessee. (Doc. 28:1). Defendant The Paul Revere Life Insurance Company ("Paul Revere") is a Massachusetts corporation with its principal place of business in Massachusetts. (Doc. 28:1). Defendant Provident Life and Accident Insurance Company ("Provident") is a Tennessee corporation with its principal place of business in Tennessee. (Doc. 28:1-2). Plaintiff alleges an amount in controversy in excess of $75,000.00, and diversity jurisdiction is therefore proper pursuant to 28 U.S.C. § 1332.

On or about June 4, 1992, Dr. Hepp was issued an individual disability policy from Paul Revere. (Doc. 147:1). This Policy was #01025591750 ("Policy 1"). (Doc. 147:1). On or about September 19, 1994, Dr. Hepp was issued another individual disability policy. (Doc. 147:1). This policy was from Provident and is Policy #52-05103794 ("Policy 2"). (Doc. 147:1). Collectively, Policy 1 and Policy 2 will be referred to as "the Policies." Paul Revere and Provident are subsidiaries of Unum. (Doc. 28:2). Unum administers all claims on behalf of Paul Revere and Provident. (Doc. 28:2).

Dr. Hepp obtained a degree in medicine from Tufts University in 1984. (Doc. 147:4). He completed three years of internship and residency in internal medicine from 1984 to 1987 at Harvard-Deaconess Hospital in Boston, Massachusetts. (Doc. 147:4). Following two years of cardiology fellowship at Presbyterian University in Philadelphia, Pennsylvania, Dr. Hepp completed a one-year fellowship in electrophysiology at Presbyterian University. (Doc. 147:4). Electrophysiology is a subspecialty of cardiology. (Doc. 148:2).

Dr. Hepp received board certification in Internal Medicine in 1987, board certification in Cardiovascular Disease in 1989, and board certification for Clinical Cardiac Electrophysiology in 1994. (Doc. 147:5). At all times up until May of 2011, Dr. Hepp was board certified in Clinical Cardiac Electrophysiology and performed invasive cardiac electrophysiology procedures. (Doc. 147:5). From 2010 through the present, Dr. Hepp has worked for The Heart Specialists in Sarasota, Florida. (Doc. 147:5).

Dr. Hepp suffered sudden numbness and severe pain in his arm during a surgical procedure on May 20, 2011. (Doc. 147:5). Dr. Hepp suffered two herniated discs. (Doc. 147:5). The invasive procedures performed by an electrophysiologist require the use of a lead apron. (Doc. 148:3). After his injury, Dr. Hepp was medically restricted from performing any invasive electrophysiological procedures that require the use of a lead vest. (Doc. 147:5). The invasive procedures that Dr. Hepp was performing, EP studies and ablations, both require the use of a lead vest. (Doc. 147:5). Dr. Hepp continues to work, however his practice is devoid of invasive electrophysiology procedures. (Doc. 148:17).

On June 5, 2011, Dr. Hepp filed a written notice of claim with Unum stating that he was an invasive Electrophysiologist who could no longer perform procedures due to herniated discs in his neck. (Doc. 147:5). Plaintiff's claim was initially assigned to Dawn Doud, a Disability

4

Benefits Specialist at Unum. (Doc. 148:14). On March 9, 2012, Ms. Doud informed Plaintiff that

he did not qualify for "Total Disability" benefits, but rather only qualified for "Residual

Disability" Benefits. (Doc. 146:15).  Melissa Walsh, an Appeals Specialist at Unum, conducted

an internal appeal at Plaintiff's request on September 18, 2012. (Doc. 148:16). On December 14,

2012, Ms. Walsh informed Plaintiff's counsel that the initial determination on Plaintiff's claim

was upheld. (Doc. 148:16).

The parties dispute whether Plaintiff was entitled to residual disability benefits or total

disability benefits. Defendants contest that Plaintiff's pre-injury practice consisted of both

electrophysiology and general cardiology. (Doc. 148:2). Defendants argue that Plaintiff's ability

to continue to practice non-invasive, general cardiology procedures precludes his recovery of

total disability benefits under the Policies. (Doc. 149). Additionally, Defendants argue that

Plaintiff's inability to perform only invasive procedures precludes his ability to recover total

disability benefits under the Policies. (Doc. 149). Conversely, Plaintiff argues that Defendants

solely denied Plaintiff's claim for total disability benefits as part of a larger "scheme" to use

CPT codes to classify medical specialists out of their occupations and pocket the money. (Doc.

145:13). Plaintiff brought this suit on November 6, 2013, alleging nine counts against the

Defendants. (Doc. 1).

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states that a "court shall grant summary judgment if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary

judgment bears the initial burden of "informing the district court of the basis for its motion, and

identifying those portions of 'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). This burden is discharged when the moving party demonstrates to the Court that there is "an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S. Ct. at 2554. When the moving party meets this initial burden, the nonmoving party must then designate specific facts showing that there exists some genuine issue of material fact to defeat summary judgment. *Dixon v. Odwalla, Inc.*, 403 Fed. App'x 350, 351 (11th Cir. 2010) (citing *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir. 1993)).

Substantive law determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In ruling on state-law claims, such as the insurance dispute at issue in this case, the Court must follow state—that is, Florida—law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 822, 82 L. Ed. 1188 (1938). Issues of fact are "genuine" only if a reasonable jury, considering the evidence presented, could find for the nonmoving party. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511. In determining whether a material issue of fact exists, "the court must construe the facts and draw all rational inferences therefrom in the manner most favorable to the nonmoving party." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1343 (11th Cir. 2015) (citations omitted). The Court does not make credibility determinations or weigh the evidence. *Id.* Rather, "[i]f the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." *Tullius v. Albright*, 240 F.3d 1317, 1320 (11th Cir. 2001) (quoting *Clemons v. Dougherty Cnty.*, 684 F.2d 1365, 1369 (11th Cir. 1982)). The Court's function is not to decide issues of fact, but rather to determine if issues of fact exist. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1299 (11th Cir. 1983).

Dɪsᴄᴜssɪᴏɴ

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**Count One: Breach of Contract**

Defendants argue that summary judgment is due on Plaintiff's breach of contract claim. (Doc. 149:4). Defendants contend that, reading each contract as a whole and viewing the evidence, Plaintiff is residually disabled as opposed to totally disabled. (Doc. 149:4-10). Conversely, Plaintiff believes that the evidence mandates a decision that Plaintiff is totally disabled. As such, Plaintiff has also moved for summary judgment on Count One. (Doc. 145).

The two policies have different provisions. Under Florida law, interpretation of an insurance contract is a matter of law to be decided by the court. *Gas Kwick, Inc. v. United Pacific Ins. Co.*, 58 F.3d 1536, 1538-39 (11th Cir. 1995) (citing *Gulf Tampa Drydock Co. v. Great Atlantic Ins. Co.*, 757 F.2d 1172, 1174 (11th Cir. 1985)). That said, once the terms of a contract are settled or if those terms are unambiguous to begin with, factual issues as to the parties' intent or what actually occurred between the parties cannot be decided on summary judgment and must be left to the fact finder. *Universal Underwriters Ins. Co. v. Steve Hull Chevrolet, Inc.*, 513 So. 2d 218, 219 (Fla. Dist. Ct. App. 1987).

"Florida law provides that insurance contracts are construed in accordance with the plain language of the policies as bargained for by the parties." *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000). Additionally, individual policy provisions "should not be considered in insolation, but rather, the contract shall be construed according to the entirety of its terms...." *Gen. Star Indem. Co. v. W. Fla. Vill. Inn, Inc.*, 874 So. 2d 26, 30 (Fla. 2004). When relevant policy language can be read in more than one reasonable interpretation—one which provides

coverage and another that limits coverage—the insurance policy's language is ambiguous. *Auto-Owners Ins. Co.*, 756 So. 2d at 34.

In the State of Florida, all ambiguities in insurance contracts are construed against the insurer. *Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135, 1140 (Fla. 1998). *See also Berkshire Life Ins. Co. v. Adelberg*, 698 So. 2d 828 (Fla. 1997) ("It has long been a tenet of Florida insurance law that an insurer, as the writer of an insurance policy, is bound by the language of the policy, which is to be construed liberally in favor of the insured and strictly against the insurer.") However, "[a]lthough ambiguous provisions are construed in favor of coverage, to allow for such a construction the provision must actually be ambiguous." *Taurus Holdings, Inc. v. U.S. Fidelity and Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005). Courts may not "rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the party." *Id.* (quoting *State Farm Mut. Auto. Ins. Co. v. Pridgen*, 498 So. 2d 1245, 1248 (Fla. 1986)). The Court will look at the language of each policy separately.

## Policy 1: Paul Revere Life Insurance Company, Policy # 01025591750

Both parties agree that the language included in Policy 1 states:

"Total Disability" means that because of Injury or Sickness:
a.      You are unable to perform the important duties of Your Occupation; and
b.      You are receiving Physician's Care.

"Residual Disability", prior to the Commencement Date, means that due to Injury or Sickness which begins prior to age 65:
a.  (1) You are unable to perform one or more of the important duties of Your
        Occupation; or
    (2) You are unable to perform the important duties of Your Occupation for more than
        80% of the time normally required to perform them; and
b.      You are receiving Physician's Care. We will waive this requirement if We receive
        written proof acceptable to Us that further care would be of no benefit to You; and
c.      You are not Totally Disabled.

"Your Occupation" means the occupation or occupations in which You are regularly engaged at the time disability begins.

(Doc. 147:2-3).

Before considering whether Plaintiff was "unable to perform the important duties of [his] Occupation" or whether Plaintiff was "unable to perform one or more of the important duties of [his] Occupation," the Court must determine the meaning of the term "occupation."

Policy 1 contains a provision defining the phrase "Your Occupation." However, the definition does not provide much insight—"Your Occupation" is defined as "the *occupation or occupations* in which You are regularly engaged at the time disability begins." (Doc. 147:2-3) (emphasis added). By defining "occupation" as "occupation or occupations," the policy creates the possibility for multiple interpretations. For example, Plaintiff's occupation could be interpreted as limited to his specialty—allegedly, an electrophysiologist, to the branch of medicine that he practices under—a cardiologist, or even as broadly as his general "occupation" of medicine—a medical doctor.

When relevant policy language can be read in more than one reasonable interpretation, the insurance policy's language is ambiguous. *Auto-Owners Ins. Co.*, 756 So. 2d at 34. While "Your Occupation" is defined in the policy, the definition does not provide any insight into what is meant by "occupation." Given the different reasonable interpretations of "occupation," the term is ambiguous. Under Florida law, all ambiguities in insurance contracts are construed against the insurer. *Deni Assocs. of Fla., Inc.*, 711 So. 2d at 1140. Therefore, this Court should construe the term "occupation" against the insurer.

The parties dispute whether Plaintiff was solely an electrophysiologist or was a cardiologist and electrophysiologist. *See* (Doc. 148:2) ("Defendants maintain that Plaintiff's pre-disability practice consisted of both electrophysiology and general cardiology."); (Doc. 154:6)

("Just as a caterpillar *becomes* a butterfly, a Cardiologist *becomes* an Electrophysiologist when they graduate their EP Fellowship and become board certified.").

Construing the ambiguous term against the insurer, "occupation" should be narrowly construed. Assuming that Plaintiff can demonstrate evidence that he practiced *only* his specialty, "occupation" should be confined to electrophysiology. If the evidence demonstrates that Plaintiff performed his specialty and general cardiology, then Plaintiff's "occupation" would be broader.

Defendants present evidence that attempts to show that Plaintiff did not perform enough, and a wide enough variety of, invasive electrophysiological procedures. (Doc. 148:10). Defendants also show evidence that Plaintiff indicated that he performed both practices when asked to list his "field(s) of specialty." (Doc. 148:13). Defendants also have evidence that the amount of time Plaintiff spent in the electrophysiology lab was less than the time he worked in his office practice. (Doc. 148:10).

Plaintiff, however, presents evidence that Dr. Hepp was performing more ablations and EP studies than required for minimum competency as an electrophysiologist. (Doc. 155:7). Plaintiff also has evidence that Dr. Hepp performed the appropriate range of electrophysiology procedures. (Doc. 154:9). Plaintiff shows evidence that it is customary for electrophysiologists to describe themselves as cardiologists simply because electrophysiology is not well-known. (Doc. 146:10-11). In all, Plaintiff presents enough evidence outside of the pleadings by which a reasonable jury could conclude that his occupation was limited to being an electrophysiologist at the time of his injury.

Even assuming that Plaintiff's occupation was limited to his specialty, Defendants could still be due on summary judgment. Assuming Plaintiff's occupation is limited to electrophysiology, the Court can read the provisions of Policy 1 with meaning. Defendants

correctly note that the Court must read the policy provisions in conjunction. *See Gen. Star Indem. Co.*, 874 So. 2d at 30 ("In construing an insurance policy, courts should read the policy as a whole, endeavoring to give every provision its full meaning and operative effect.") (citations omitted). In conjunction, it is clear that the Plaintiff cannot be *both* residually disabled and totally disabled.

When reading the total disability benefits provision with the residual disability benefits provisions, Defendants argue that "Plaintiff must be unable to perform *all, or at least the majority*, of his important/substantial and material duties to receive total disability benefits." (Doc. 149:4) (emphasis added). While not explicitly stating so, Defendants assert that Policy 1's clause (a) under Total Disability should be viewed as mutually exclusive to clause (a)(1) under Residual Disability.

However, reading the policy as a whole and endeavoring to give every provision full meaning and operative effect, this Court cannot view Total Disability clause (a) as mutually exclusive to Residual Disability clause (a)(1). In order to be residually disabled under Policy 1, clause (c) states that "You are not Totally Disabled." (Doc. 147:2). This clause assumes that there is potential for overlap between other qualifications under Total Disability and Residual Disability—any reading to the contrary would render clause (c) as superfluous. While the Total Disability provision and the Residual Disability provision are mutually exclusive, it is not because of clause (a) under Total Disability and clause (a)(1) under Residual Disability—these clauses about the insured's ability to perform important duties are not mutually exclusive.

Defendants cites to a number of cases that have different policy language from the clause in this current dispute. *See* (Doc. 149:4-6). In these cases, there were no clauses like clause (c) under the Residual Disability provision.

Reading the policy as a whole, the Court must not reach the conclusion that the insured is "unable to perform all, or at least the majority, of his important" duties to qualify for total disability. In fact, such a reading would render clause (c) as meaningless. The Court must determine, therefore, the meaning of "the important duties" under clause (a) of Total Disability. (Doc. 147:2). This meaning should not be constrained by clause (a)(1) under Residual Disability.

Under the Total Disability clause (a), there is no language that quantifies the amount of "the important duties" to establish total disability. (Doc. 147:2). While the Defendants argue that the clause should be read as the insured is unable to perform *all* of the important occupational duties, this is not the language in the policy. *See Giddens v. Equitable Life Assur. Soc'y of U.S.*, 445 F.3d 1286, 1301 (11th Cir. 2006) ("The language of the Residual Disability clause does not suggest where that line should be drawn and certainly does not require that it be drawn only where Equitable suggests. If Equitable means 'all' in its Total Disability clause, then Equitable may make that simple change to its policy forms.").

Even still, Defendants claim that Plaintiff purports that performing invasive procedures was the *only* important job duty before his injury. (Doc. 149:6). Therefore, even assuming that Plaintiff must be unable to perform "all" of the important duties of his occupation, if invasive procedures are the *only* important duty of his occupation, Plaintiff could still be entitled to total disability benefits under Policy 1's provision.

However, the policy's clause (a) under Total Disability is open to a number of other reasonable interpretations than simply requiring "all" important duties. The court must draw a line somewhere. *See Giddens*, 445 F.3d at 1301. ("At some point, a line must be drawn where the disability becomes so severe, and affects such a large percentage of the insured's material and substantial duties, that the disability is total rather than residual."). Given that the policy is open

12

to more than one reasonable interpretation, the policy's language is ambiguous. *Auto-Owners, Ins. Co.*, 756 So. 2d at 34. As all ambiguities in insurance contracts under Florida law are construed against the insurer, the Total Disability clause (a) should not be read as requiring the Plaintiff's inability to perform *all* of his occupation's important tasks. *Deni Assocs. of Fla., Inc.*, 711 So. 2d at 1140.

Total disability is a question that is properly presented to a jury for a factual determination. *Ames v. Provident Life and Accident Ins. Co.*, 942 F. Supp. 551, 556 (S.D. Fla. 1994) ("Whether or not Dr. Ames was totally disabled was a question properly presented to the jury for a factual determination to be made from the terms of the policy and the evidence adduced at trial."), aff'd, 86 F.3d 1168 (table). *See also Sun Life Ins. Co. of America v. Evans*, 340 So. 2d 957, 959 (Fla. Dist. Ct. App. 1976).

Defendants argue that (1) Plaintiff devoted "about twice as much time to his non-invasive cardiology practice as compared to his invasive electrophysiology practice" (Doc. 149:6), (2) that Plaintiff's own expert stated that about 70% of electrophysiology patients do not need invasive electrophysiology procedures (Doc. 149:7), and (3) that Plaintiff still continues to do some work as an Electrophysiologist (Doc. 149:10).

Conversely, Plaintiff offers evidence that, because Dr. Hepp could no longer perform any invasive procedures, he was not qualified to even diagnose what invasive electrophysiological procedures patients required. (Doc. 154:8). Plaintiff contests the amount of pre-injury time that he devoted to performing invasive procedures. (Doc. 154:8). Plaintiff also presents evidence that one cannot be an Electrophysiologist without the ability to perform invasive electrophysiological procedures. (Doc. 154:10).

Clearly, there is conflicting evidence regarding what make up "the important duties" of Plaintiff's occupation and as to whether Plaintiff is able to perform these important duties. Defendants focus on the quantitative evidence, while Plaintiff attempts to emphasis qualitative aspects of his occupation. A fact finder is needed to determine the duties that were "important" and determine Plaintiff's continued ability to perform these important duties. Considering the evidence presented, a reasonable jury could find in the Plaintiff's favor as to material facts. Accordingly, Defendants are not entitled to judgment as a matter of law and, therefore, summary judgment is not appropriate.

**Policy 2: Provident Life and Accident Insurance Company, Policy #52-05103794**

Both parties agree that the language included in Policy 2 states:

Total Disability or totally disabled means that due to Injuries or Sickness:
1.  You are not able to perform the substantial and material duties of your occupation; and
2.  You are receiving care by a Physician which is appropriate for the condition causing the disability.

Residual Disability or residually disabled, during the Elimination Period, means that due to Injuries or Sickness:
1.  you are not able to do one or more of your substantial and material daily business duties or you are not able to do your usual daily business duties for as much time as it would normally take you to do them;
2.  you have a Loss of Monthly Income in your occupation of at least 20%; and
3.  you are receiving care by a Physician which is appropriate for the condition causing disability. We will waive this requirement when continued care would be of no benefit to you.

Your occupation means the occupation (or occupations, if more than one) in which you are regularly engaged at the time you become disabled. If your occupation is limited to a recognized specialty within the scope of your degree or license, we will deem your specialty to be your occupation.

(Doc. 147:3-4).

Again, the Court will have to determine what the term "occupation" means for purposes of the provisions in Policy 2. As opposed to Policy 1, Policy 2 contains a more narrowly defined

14

definition of "occupation." While still initially defining "occupation" as "the occupation (or occupations, if more than one)," Policy 2 also states that "[i]f your occupation is *limited to a recognized specialty* within the scope of your degree or license, we will deem your specialty to be your occupation." (Doc. 147:3-4) (emphasis added).

The parties agree that electrophysiology is a recognized specialty of internal medicine. (Doc. 155:4); (Doc. 148: 2). The parties agree that a cardiologist goes through additional training to become an electrophysiologist. (Doc. 147:4). The parties also agree that Dr. Hepp completed a one-year fellowship in electrophysiology and received a board certification for clinical cardiac electrophysiology. (Doc. 147:4-5). In all, electrophysiology constitutes a recognized specialty under the provision.

While this limiting statement to the definition of "occupation" is not ambiguous, the parties dispute its application. "Defendants maintain that Plaintiff's pre-disability practice consisted of both electrophysiology and general cardiology." (Doc. 148:2). Plaintiff argues that Dr. Hepp was solely an electrophysiologist before his injury. (Doc. 154:6). For Plaintiff's occupation to be considered an electrophysiologist under the second sentence of the provision for "your occupation," Plaintiff's pre-disability practice would have to "limited to" his specialty. If Plaintiff's pre-disability practice was not "limited to" electrophysiology, then his occupation would be broader.

The Defendants present evidence that Plaintiff's work was not "limited to" electrophysiology. Specifically, Defendants present evidence that attempts to show Plaintiff did not perform enough, and a wide enough variety of, invasive procedures consistent with electrophysiology. (Doc. 148:10). Defendants show evidence that Plaintiff indicated he performed both cardiology and electrophysiology when asked to list his "field(s) of specialty."

(Doc. 148:13). Defendants also present evidence that Plaintiff was advertised as having two specialties by his employer. (Doc. 148:10).

Conversely, Plaintiff presents evidence that Dr. Hepp was performing more ablations and EP studies than required for minimum competency. (Doc. 155:7). Plaintiff also has evidence that Dr. Hepp performed the appropriate range of electrophysiology procedures for his age and training. (Doc. 154:9) Plaintiff also shows evidence that it is customary for electrophysiologists to describe themselves as cardiologists simply because electrophysiology is not well-known. (Doc. 146:10-11).

This factual dispute must be submitted to a jury to determine if Plaintiff's occupation was "limited to" electrophysiology. The Court does not make credibility determinations or weigh the evidence. *Ga. State Conf. of NAACP*, 775 F.3d at 1343. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." *Tullius*, 240 F.3d at 1320. Here, when construing the facts and drawing all reasonable inferences therefrom in favor of the Plaintiff, there is enough evidence that a reasonable jury could find for that the Plaintiff's occupation was limited to electrophysiology. *Ga. State Conf. of NAACP*, 775 F.3d at 1343; *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511.

Summary judgment may still be appropriate if Defendants were entitled to judgment even though the evidence of Plaintiff's occupation was construed against them. Assuming that Plaintiff's occupation was "limited to" electrophysiology, his "occupation" would be considered an electrophysiologist for Policy 2. This term would be applied to the provisions regarding Total Disability and Residual Disability.

"In construing an insurance policy, courts should read the policy as a whole, endeavoring to give every provision its full meaning and operative effect." *Gen. Star. Indem. Co.*, 874 So. 2d

at 30. The Total Disability and Residual Disability provisions must be read in conjunction. Unlike Policy 1, there is no clause under the Residual Disability provision that states "You are not Totally Disabled." (Doc. 147:2-3). Therefore, clause (1) under Total Disability can be compared with clause (1) under Residual Disability. Reading the Policy as a whole, the Court keeps in mind that these provisions should be mutually exclusive. Reading to the contrary would render the provisions superfluous.

However, the Court does not agree that Plaintiff must be unable to perform *all* of his substantial and material duties to receive total disability. Defendants cite to *Potter v. Liberty Life Assur. Co. of Boston*, 132 Fed. App'x 253 (11th Cir. 2005). In this case, the policy defined "partial disability" as the situation where the insured is able to perform "one or more, *but not all*" of the material and substantial duties of his occupation. *Id.* at 257. (emphasis added). The Eleventh Circuit agreed with the insurer's interpretation that the "disabled" and the "partially disabled" provisions were mutually exclusive and must be compared to each other. *Id.* at 258. When compared to each other, the Court supported the reading that the insured must be unable to perform *all* duties of his or her occupation to qualify for the "disabled" category. *Id.*

The provision in *Potter* differs from the provision in Policy 2 in one important aspect—while the *Potter* provision for partial disability is defined as inability to perform "one or more, *but not all*" duties, the clause for residual disability in Policy 2 is only defined as inability to perform "one or more" duties. 132 Fed. App'x at 257-58; (Doc. 147:3-4). The critical omission of "but not all" duties is important because it affects the reading of the provisions in conjunction. Reading the provisions in *Potter* in conjunction, the Eleventh Circuit agreed with the reasoning that "but not all" established that partial disability was inability to perform tasks up to the point of inability to perform *all* substantial and material tasks. 132 Fed. App'x at 258.

Consequently, "disability" would not be established until the insured was unable to perform *all* important tasks. *Id.* Here, such a reading is not reasonable. Taken to the full bounds, inability to perform "one or *more*" duties under Policy 2 would include all duties. (Doc. 147:3).

Nevertheless, Policy 2's Total Disability and Residual Disability provisions are mutually exclusive because Plaintiff cannot be totally disabled and residually disabled at the same time. Therefore, "[a]t some point, a line must be drawn where the disability becomes so severe, and affects such a large percentage of the insured's material and substantial duties, that the disability is total rather than residual." *Giddens*, 445 F.3d at 1301. However, given that the policy is open to more than one reasonable interpretation about where to draw this line, the policy's language is ambiguous. *Auto-Owners, Inc. Co.*, 756 So. 2d at 34. Construing this ambiguity against the insurer, the Court cannot require that Plaintiff is unable to perform *all* of the substantial and material duties of his occupation. If Defendants wish to require inability to perform *all* duties to establish Total Disability, Defendants can write it into their policies.

Assuming for Defendants' motion for summary judgment that Plaintiff's occupation is limited to his specialty, the Court must consider the same evidence that was analyzed for Policy 1. Just as this evidence demonstrated that there were genuine issues of material fact for Policy 1, the same conclusion is reached for Policy 2 even though the language differs slightly. Much like the jury will have to determine the "important duties" under Policy 1, the jury will have to consider what the "substantial and material duties" of Plaintiff's occupation are, and whether he can perform them under Policy 2. Without requiring an inability to perform *all* "substantial and material duties," a reasonable jury could find in favor of the Plaintiff. Accordingly, summary judgment is inappropriate.

**Conclusion**

In conclusion, there are genuine issues of material facts and Defendants are not entitled to judgment as a matter of law under both Policy 1 and Policy 2. Accordingly, Defendants' motion for summary judgment as to Count One is **DENIED**.

**Count Two: Violation of Chapter 624 of the Florida Statutes (Bad Faith)**

This Count has been abated until a breach of contract can be established. (Doc 27:10).

**Count Three: Breach of Fiduciary Duties**

Defendants argue that summary judgment is due on Plaintiff's claim for breach of fiduciary duties because there is no fiduciary relationship between Plaintiff and Defendants. (Doc. 149:11). Defendants argue that because Florida does not recognize a fiduciary relationship between an insurer and its insured in the context of coverage disputes, there can be no fiduciary relationship between Plaintiff and Defendants. (Doc. 149:11). Essentially, this is the same argument that Defendants raised in their Motion to Dismiss (Doc. 11).

The elements of a cause of action for breach of fiduciary duty are: (1) the existence of a fiduciary duty, (2) breach of that duty, and (3) damages flowing from the breach. *Crusselle v. Mong*, 59 So. 3d 1178, 1181 (Fla. Dist. Ct. App. 2011) (citing *Rocco v. Glenn, Rasmussen, Fogarty & Hooker, P.A.*, 32 So. 3d 111, 116 n. 2 (Fla. Dist. Ct. App. 2009)). In Florida, a fiduciary relationship may be express or implied. *Hogan v. Provident Life and Acc. Ins. Co.*, 665 F. Supp. 2d 1273, 1287 (M.D. Fla. 2009) (citing *Maxwell v. First United Bank*, 782 So. 2d 931, 933 (Fla. Dist. Ct. App. 2001)). Contracts or legal proceedings create express fiduciary relationships. *Id.* Implied fiduciary relationships "are premised upon the specific factual situation surrounding the transaction and the relationship of the parties" and exist where "confidence is

reposed by one party and a trust accepted by the other." *Id.* (quoting *Capital Bank v. MVB, Inc.*, 644 So. 2d 515, 518 (Fla. Dist. Ct. App. 1994)).

There is no fiduciary relationship between an insurer and an insured under Florida law. *Time Ins. Co., Inc. v. Burger*, 712 So. 2d 389, 391 (Fla. 1998). Plaintiff does not contend that Defendant Paul Revere or Defendant Provident are not insurers. Rather, Plaintiff argues that Defendant Unum, as an insurance holding company, is not an insurer. (Doc. 154:13).

Whether or not a holding company qualifies as an "insurer" is a factually dependent inquiry. *Hogan*, 665 F. Supp. 2d at 1286. "Insurer" is defined to include "every person engaged as indemnitor, surety, or contractor in the business of entering into contracts of insurance or of annuity." Fla. Stat. § 624.03. Plaintiff argues that there is no evidence that Defendant Unum is an insurer and that Defendants have told the Court that it is not. (Doc. 154:13). Plaintiff argues that Defendant Unum is an insurance holding company. (Doc. 154:13). To support this assertion, Plaintiff cites to Defendants' Motion for Summary Judgment. (Doc. 149:2) ("Unum Group, the holding company for subsidiary insurers Paul Revere and Provident....").

Construing all facts in favor of Plaintiff, a reasonable jury could find that Defendant Unum is not an insurer and that a fiduciary relationship is not barred as a matter of law.

As the basis for the fiduciary relationship, Plaintiff alleges that "Unum was entrusted with the management of Dr. Hepp's premiums as well as to adjust his claim for disability." (Doc. 154:13). "One who is entrusted with the management of another's money owes a fiduciary relationship to that person." *Traditions Senior Mgmt., Inc. v. United Health Adm'rs, Inc.*, No. 8:12-cv-2321-T-30MAP, 2013 WL 3285419 (M.D. Fla. June 27, 2013). As a holding company for Plaintiff's premiums (Doc. 154:13), a reasonable jury could conclude that Defendant Unum had a fiduciary relationship with Plaintiff.

20

There are genuine issues of material fact regarding Defendant Unum's status as an insurer and regarding the other elements required to establish a breach of fiduciary duty. Accordingly, Defendants' motion for summary judgment as to Count Three is **DENIED**.

**Count Four: Breach of Covenant of Good Faith and Fair Dealing**

This Count has been abated until a breach of contract can be established. (Doc 27:10).

**Counts Five through Seven: RICO Claims**

Plaintiff alleges that Defendants intentionally targeted high indemnity own-occupation claims for denial in order to "pocket the reserve on such denied claims and use it to run their business and provide incentive compensation to its employees." (Doc. 154:15). In doing so, Plaintiff alleges that Defendants carried out a racketeering scheme in violation of 18 U.S.C. § 1962 (a), 18 U.S.C. § 1962 (b), and 18 U.S.C. § 1962 (c). Defendants argue that summary judgment is proper for these claims because: (1) "[t]here is no evidence of a nexus between the alleged predicate acts and Unum's alleged participation in or control over the operations of any enterprise" (Doc. 149:13), (2) there is no evidence of illegal activity (racketeering activity) (Doc. 149:13), (3) there is no "racketeering injury" (Doc. 149:17), (4) there is no evidence that Defendants' actions could have proximately caused any alleged racketeering injury (Doc. 149:17), (5) there is no evidence that Defendants' determination of Plaintiff's claim was under any alleged "scheme" (Doc. 149:18), and (6) there is no evidence of an "enterprise" because the distinctness requirement cannot be established as a matter of law (Doc. 149:19).

The provisions of 18 U.S.C. § 1961 *et seq.* (the RICO Act) provide civil and criminal liability for persons engaged in "a pattern of racketeering activity." *See* 18 U.S.C. § 1962 (a-d). To prevail on a civil RICO claim, a plaintiff must establish four elements: "(1) conduct (2) of an

enterprise (3) through a pattern (4) of racketeering activity." *Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1311 (11th Cir. 2000).

Defendants argue that there is no evidence of illegal activity. (Doc. 149:13). The RICO statute defines "racketeering activity" as the enumerated crimes listed in 18 U.S.C. § 1961 (1). These crimes include mail fraud and wire fraud—which Plaintiff alleges form Defendants' racketeering activity. 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud); (Doc. 154:15).

> A plaintiff must prove the following elements to establish liability under the federal mail and wire fraud statutes: (1) that defendants knowingly devised or participated in a scheme to defraud plaintiffs, (2) that they did so willingly with an intent to defraud, and (3) that the defendants use the U.S. mails or the interstate wires for the purpose of executing the scheme.

*Langford*, 231 F.3d at 1312.

Under the mail and wire fraud statutes, a plaintiff must allege a scheme to defraud wherein "some type of deceptive conduct occurred." *McCulloch v. PNC Bank, Inc.*, 298 F.3d 1217, 1225 (11th Cir. 2002) (citation omitted). In *Natarajan v. Paul Revere Life Ins. Co.*, 720 F. Supp. 2d 1321, 1332 (M.D. Fla. 2010), this Court found that the sole use of CPT code analysis to classify medical specialists out of their occupation is a plausible RICO scheme. Plaintiff alleges that "[t]he predicate acts of mail and wire fraud include letters from Defendants to Dr. Hepp and others both asking for CPT codes 'to determine duties' and conveying the fraudulent results of the CPT code analysis as a basis to deny claims (fraudulently omitting Defendants' knowledge that the CPT codes were being used improperly used [sic] to deny claims)." (Doc. 154:15). Plaintiff apparently argues that there were two types of deceptive conduct: (1) asking for CPT codes "to determine duties" and (2) fraudulently omitting that the CPT codes were being improperly used to deny claims.

In their request for CPT codes, Defendants stated: "To help us better understand the occupational duties, please provide the practice analysis or procedure/production summary for [Plaintiff]." (Doc. 154-4:5). Plaintiff argues that, in reality, Defendants were simply using the CPT code information to classify "medical specialist[s] out of their occupation in order to deny total disability." (Doc. 154:15). *If* Plaintiff is able to prove the allegations regarding Defendants' scheme and its application to his claims process at trial, Plaintiff will be able to establish that Defendants' requests for CPT codes "to determine duties" were deceptive.

"Nondisclosure of material information can constitute a violation of the mail and wire fraud statutes where a defendant has a duty to disclose, either by statute or otherwise." *McCulloch*, 298 at 1225. In Count Three, Plaintiff argues that Defendant Unum stands in a fiduciary relationship with Plaintiff. (Doc. 1:41). "A defendant's breach of a fiduciary duty may be a predicate for a violation of the mail fraud statute where the breach entails the violation of a duty to disclose material information… An affirmative duty to disclose need not be explicitly imposed; it may instead be implicit in the relationship between the parties." *Ayres v. General Motors Corp.*, 234 F.3d 514, 521 (11th Cir. 2000) (quoting *United States v. Waymer*, 55 F.3d 564, 571 (11th Cir. 1995)). Therefore, if Plaintiff can establish his claim for breach of fiduciary duty, Defendants' failure to disclose information may form another basis for deceptive conduct required to establish mail and wire fraud.

Defendants argue that there is no evidence that Plaintiff's claims were determined under any alleged scheme. (Doc. 149:18). The *sole* use of CPT code analysis to classify medical specialists out of their occupation is a plausible RICO scheme. *Natarajan*, 720 F. Supp. 2d at 1332. Defendants allege that CPT codes were only one piece of information used to determine Plaintiff's disability status. (Doc. 149:15). Defendants claim that their determination process was

also based on a review of claims forms filled out by Plaintiff. (Doc. 149:15). Allegedly, the determination was also based on internet research (Doc. 149-1:8) and a phone conversation a claims agent conducted with the Plaintiff (Doc. 149-1:9).

Plaintiff claims that Defendants' alleged scheme was a result of underperformance of a specific division of Defendants' company. (Doc. 154:16). Plaintiff argues that Defendants switched from claims payment to "claims management" in order to increase profits. (Doc. 154:15). As such, Plaintiff alleges that Defendants would solely use CPT code analysis to classify specialists, like Plaintiff, out of their occupation and deny total disability. (Doc. 154:15).

Plaintiff presents evidence that Defendants agree that CPT codes are not accurate for distinguishing important or material and substantial duties. (Doc. 155:14). Despite this, Plaintiff also presents evidence that Defendants' "Disability Benefits Specialist" assigned to Plaintiff's case for the initial disability determination, Dawn Doud, stated at a deposition that: (1) she never asked for a listing of cardiology duties (Doc. 155-3:64), (2) she never asked for a listing of electrophysiology duties (Doc. 155-3:64), (3) she doesn't know the makeup of an electrophysiology practice (Doc. 155-3:65), and (4) that she didn't compare the makeup of Plaintiff's practice with any other electrophysiology doctors (Doc. 155-3:65).

Construing the evidence and drawing all rational inferences in the Plaintiff's favor, a reasonable jury *could* find that Plaintiff's claim was determined under an alleged "scheme." *Assuming* that Defendants conducted such a scheme with Plaintiff's claim, the use of letters to gather CPT code information and inform Plaintiff of his claim status would constitute the use of the mails or wires in furtherance of a scheme to defraud another of money or property—and would establish the "racketeering activity" element required to establish a RICO claim. *Langford*, 231 F.3d at 1311.

24

Defendants also argue that Plaintiff has not established a "racketeering injury." (Doc. 149:17). However, the Supreme Court has clarified that:

> If the defendant engages in a pattern of racketeering activities in a manner forbidden by these provisions, and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under § 1964 (c). There is no room in the statutory language for an additional, amorphous "racketeering injury" requirement.

*Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 494, 105 S. Ct. 3275, 3285, 87 L. Ed. 2d 346 (1985).

Nevertheless, "[t]here is no liability if a RICO violator has not caused injury." *McCaleb v. A.O. Smith Corp.*, 200 F.3d 747, 752 (11th Cir. 2000). Plaintiff alleges that he would not have continued to pay premiums had he known about Defendants' change in policy. (Doc. 155-1:4). Plaintiff also alleges injury by (1) his claim not being honored (Doc. 1:56), and (2) the insurance market being undercut by Defendants' practices—preventing Plaintiff from a wider variety of insurance options (Doc. 1:53).

Defendants claim that their actions could not have proximately caused any injury that Plaintiff alleges. (Doc. 149:17). "A civil RICO action requires a plaintiff to prove more than "but for" causation of injury; it requires proximate causation." *McCaleb*, 200 F.3d at 752. In civil RICO actions, a wrongful act is "a proximate cause if it is 'a substantial factor in the sequence of responsible causation.'" *Maiz v. Virani*, 253 F.3d 641, 675 (11th Cir. 2001) (quoting *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1399 (11th Cir. 1994)).

It is somewhat clear that Plaintiff would not have continued to pay expensive premiums on these policies had he known that Defendants had changed their claims payment system. Certainly, if Plaintiff can prove the other elements for his RICO claims, then it is unremarkable that Defendants' actions were a substantial factor in the sequence of causation. *Id. See*

*Natarajan*, 720 F. Supp. 2d at 1333. Accordingly, construing all evidence in favor of the Plaintiff, a reasonable jury could find that Defendants proximately caused Plaintiff's injury.

Defendants challenge the ability of Plaintiff to prove an "enterprise" under the RICO statute. (Doc. 149:19). Specifically, Defendants argue that the distinctness requirement cannot be established as a matter of law. (Doc. 149:19). An "enterprise" under the RICO statute includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961 (4) (2012). The RICO "enterprise" must be separate and distinct from the RICO defendant. *U.S. v. Goldin Industries, Inc.*, 219 F.3d 1268, 1271 (11th Cir. 2000), *cert. denied*, 531 U.S. 1015 (2000).

The Defendants cite to *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984). In this case, the Supreme Court stated that "[a] parent and its wholly owned subsidiary have a complete unity of interest." *Id.* at 771, 104 S. Ct. at 2741. Defendants also cite to *Bucklew v. Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923 (7th Cir. 2003). Here, the Seventh Circuit stated, "A parent and its wholly owned subsidiaries no more have sufficient distinctness to trigger RICO liability than to trigger liability for conspiring in violation of the Sherman Act." *Id.* at 934 (citing *Copperweld Corp.*, 467 U.S. at 777).

The Court notes that "distinctness is a fact-intensive inquiry that is not driven solely by formal legal relationships." *Lockheed Martin Corp. v. Boeing Co.*, 314 F. Supp. 2d 1198, 1212 (M.D. Fla. 2004). Here, Plaintiff has provided that evidence that Defendant Provident is not a "wholly owned" subsidiary of Defendant Unum. (Doc. 154:18). A rational jury could find that Defendants satisfy the distinctness requirement and form an enterprise. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." *Tullius*, 240 F.3d at 1320 (quoting *Clemons*, 684 F.2d at 1369).

Given that there are genuine disputes to material facts, Defendants are not entitled to judgment as a matter of law. Defendants' motion for summary judgment as to Count Five, Six, and Seven is **DENIED**.

## Count Eight: Fraud as to Statements and Omissions Regarding Nature and Quality of Policy

Plaintiff alleges that Defendants' agent and employee informed Plaintiff that "if he ever became unable to practice *Electrophysiology* due to injury or sickness he would be considered totally disabled under the terms of the policy." (Doc. 1:58). In reliance on this statement, "Plaintiff purchased the policy and dutifully paid thousands of dollars in premiums every year." (Doc. 1:58). Plaintiff also alleges that "Defendants never disclosed to Plaintiff that it adopted unethical or illegal claims handling practices." (Doc. 1:58). Given this new practice, Plaintiff claims that he would have less of a chance to recover in any disability claims. (Doc. 1:59).

In their motion for summary judgment (Doc. 149), Defendants assert that they are entitled to summary judgment essentially because: (1) Plaintiff's allegations conflict with the language of the policy and the specialty letter (Doc. 149:23, 25), (2) Plaintiff has not established damages connected to the fraud allegations (Doc. 149:26), (3) Plaintiff's claim is barred by the statute of repose (Doc. 149:25-26), and (4) Plaintiff's evidence from Beverly Camp, Defendants' agent and employee, is not credible (Doc. 149:23-24). There is sufficient evidence to create triable issues of fact with regard to this fraud claim, and Defendants' Motion for Summary Judgment for Count Eight must be denied.

The movant in a summary judgment proceeding must identify areas of the record where the non-moving party has failed to adduce evidence of a required element of his or her prima facie case: "Of course, a party seeking summary judgment always bears the initial responsibility

of informing the district court of the basis for its motion, and identifying those portions of 'the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex Corp.*, 477 U.S. at 323, 106 S. Ct. at 2553. That is not to say that the Defendants must

have *negated* Plaintiff's claim in order to win summary judgment, but they must at least inform

the court as to the basis for their motion.

The four essential elements of fraud under Florida law are: "(1) a false statement

concerning a specific material fact; (2) the maker's knowledge that the representation is false;

(3) an intention that the representation induces another's reliance; and (4) consequent injury by

the other party acting in reliance on the representation." *Wadlington v. Cont'l Med. Servs., Inc.*,

907 So. 2d 631, 632 (Fla. Dist. Ct. App. 2005) (citing *Cohen v. Kravit Estate Buyers, Inc.*, 843

So. 2d 989, 991 (Fla. Dist. Ct. App. 2003)). In addition to an intentional misrepresentation, fraud

may also be based on an omission of material fact. *JDI Holdings, LLC v. Jet Mgmt., Inc.*, 732 F.

Supp. 2d 1205, 1233 (N.D. Fla. 2010) (citing *Ward v. Atl. Sec. Bank*, 777 So. 2d 1144, 1146

(Fla. Dist. Ct. App. 2001)). Generally, the issue of fraud is not properly the subject of summary

judgment because a court can seldom determine the presence or absence of fraud without a trial.

*Natarajan*, 720 F. Supp. 2d at 1330 (citing *Robinson v. Kalmanson*, 882 So. 2d 1086 (Fla. Dist.

Ct. App. 2004)).

Defendants argue that "[e]ven assuming, *arguendo*, that Ms. Camp promised Plaintiff

coverage as an electrophysiologist, Plaintiff's claim that he relied on such promise 'and dutifully

paid thousands of dollars in premiums every year' fails as a matter of law" because such a

promise contradicts the terms of the parties' written agreement. (Doc. 149:24). Reliance on

fraudulent representations is unreasonable as a matter of law where the alleged

misrepresentations contradict the express terms of an ensuing written agreement. *Eclipse Medical, Inc. v. American Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 2d 1334, 1342 (S.D. Fla. 1999), *aff'd*, 235 F.3d 1344 (11th Cir. 2000) (table). *See also Barnes v. Burger King Corp.*, 932 F. Supp. 1420, 1428 (S.D. Fla. 1996).

However, in *Eclipse Medical, Inc.*, the Court stated that "[t]his Court has already determined that the Agreement's provisions pertaining to its duration are *clear and unambiguous*, therefore any claims based on Bambino's alleged representations of a different duration simply cannot, as a matter of law, be considered." 262 F. Supp. 2d at 1343 (emphasis added). *See also Wilson v. Equitable Life Assur. Soc. Of U.S.*, 622 So. 2d 25, 28 (Fla. Dist. Ct. App. 1993) ("Other cases have held that a party cannot maintain an action in fraud if the alleged misrepresentation is explicitly contradictory to a *specific and unambiguous* provision in a written contract.") (emphasis added) (citations omitted).

The Paul Revere Policy (Policy 1) that Plaintiff purchased from Ms. Camp defines "Your Occupation" as "the occupation or occupations in which You are regularly engaged at the time Disability begins." (Doc. 147:2-3). As discussed in Defendants' Motion for Summary Judgment to Count One (breach of contract), this definition does not provide much insight into what the insured's "occupation" is defined as. Accordingly, the term is ambiguous and Plaintiff's fraud claim is not barred as a matter of law.

Defendants also argue that the specialty letter from August of 1992 informed Plaintiff that he would only receive total disability benefits is he was unable to perform "the important duties of *both* cardiology and electrophysiology." (Doc. 148:7) (emphasis added). Defendants claim that this letter was sent to Beverly Camp, Defendants' agent, to be given to Plaintiff. (Doc. 148:6-7). Plaintiff, however, argues that he did not receive the specialty letter. (Doc. 155:3).

29

Additionally, Plaintiff provides a declaration of Beverly Camp, the agent whom the letter was allegedly sent to, where Ms. Camp states "I do not recall ever receiving [the specialty letter] or providing such letter to Dr. Hepp." (Doc. 155:3); (Doc. 155-1:7). This type of factual determination and weighing of credibility is properly decided by a jury.

Defendants challenge the credibility of Ms. Camp and the worthiness of her testimony. (Doc. 149:24). This challenge of credibility further reinforces the notion that a jury should weigh the evidence to determine whether Plaintiff received any specialty letter.

Defendants argue that any fraud claims based on internal policy changes cannot be supported because Plaintiff cannot establish connected damages. (Doc. 149:26). It is well-settled that actual damages are an element of an action for fraud in Florida. *Casey v. Welch*, 50 So. 2d 124, 125 (Fla. 1951); *Simon v. Celebration Co.*, 883 So. 2d 826, 833 (Fla. Dist. Ct. App. 2004). To succeed on his fraud claim, Plaintiff must prove pecuniary damages stemming from his detrimental reliance on a material misrepresentation by the Defendants. *Ragsdale v. Mt. Sinai Med. Ctr. of Miami*, 770 So. 2d 167, 169 (Fla. Dist. Ct. App. 2000).

Plaintiff alleges that "Plaintiff was directly damaged by Defendants' fraudulent omissions through loss of premiums which Defendants collected every year and by loss of income from a payout on the policy, as well as through the lost opportunity to obtain a disability policy from another company…." (Doc. 1:60). Defendants challenge that "Plaintiff has not put forth any evidence that his premiums for such alternate policy would have been any less than the premiums on the policies at issue here. Plaintiff has likewise failed to establish that any alternate policies would have paid total disability benefits based on his inability to perform invasive electrophysiology procedures." (Doc. 149:26). However, Defendants do not dispute that Plaintiff

continued to renew his policy and continued to pay premiums. As such, the damage element required for an action of fraud in Florida may be established at trial.

Defendants assert that Plaintiff's claim is barred by the statute of repose. (Doc. 149:25-29). The twelve-year statute of reposes for fraud claims in Florida provides that "an action for fraud under § 95.11(3) must be begun within 12 years after the date of the commission of the alleged fraud, regardless of the date the fraud was or should have been discovered." Fla. Stat. § 95.031(2)(a). Statutes of repose "bar actions by setting a time limit within which an action must be filed as measured from a specified act, after which time the cause of action is extinguished." *Hess v. Philip Morris USA, Inc.*, No. SC12-2153, ___ So. 3d ___, 2015 WL 1472319 (Fla. Apr. 2, 2015). "That limit is measured not from the date on which the claim accrues but instead from the date of the last culpable act or omission of the defendant." *Id.* (citing *CTS Corp. v. Waldburger*, ___ U.S. ___, 134 S. Ct. 2175, 2182, 189 L. Ed. 2d 62 (2014)). A jury is needed to determine "the last culpable act or omission of the defendant," if any, before determining whether Plaintiff's claim is barred by the statute of repose.

Defendants' motion for summary judgment as to Count 8 is **DENIED**.

**Count Nine: Fraud as to Occupational Determination, CPT Code Analysis, and Claim Determinations**

Defendants provide two arguments related to Plaintiff's Count Nine: (1) that the letter alleged in Plaintiff's complaint does not include any references to ERISA (Doc. 149:27) and (2) that Plaintiff could not have relied upon such a letter because he was already represented by counsel (Doc. 149:27).

Plaintiff's Complaint alleges that "[o]n September 9, 2012, Defendants *re-sent* to Plaintiff the *March 9, 2012* letter which contained the above alleged fraudulent statements…." (Doc. 1:63) (emphasis added). Plaintiff then alleges that "Defendants also fraudulently alleged in

this letter dated September 9, 2012 that since ERISA governs Plaintiff's plan, Plaintiff is required to participate in an internal appeal when, in fact, ERISA did not govern…." (Doc. 1:63).

In their Motion for Summary Judgment, Defendants claim that Plaintiff's claim file does not include any correspondence dated September 9, 2012, so Plaintiff must be referring to a letter from September 5, 2012. (Doc. 149:27). Defendants then state "Ms. Doud's letter did not mention ERISA, but advised that Plaintiff's appeal was due within 180 days of the March 9, 2012, decision letter." (Doc. 149:27). Defendants' reference to the March 9, 2012 letter implies their awareness to its existence and its relation to the September 5, 2012, correspondence. In the letter from March 9, 2012, which was allegedly re-sent in September of 2012, the following provision is included:

> If you dispute this determination, you have the right to bring a civil action under section 502(a) of the Employee Retirement Income Security Act following an adverse benefit determination on review. Unless there are special circumstances, this administrative appeal process must be completed before you begin any legal action regarding your claim.

(Doc. 154-3:30).

Clearly, this reference to ERISA is included in the March 9, 2012, letter that was allegedly re-sent sometime in September of 2012.

Defendants argue that Plaintiff could not have made any acts in reliance on these statements because "by September 2012, Plaintiff was already represented by his counsel in this matter and that the September 5, 2012, letter was addressed to Plaintiff's attorney." (Doc. 149:27). Presumably, Defendants argue that legal representation would have prevented Plaintiff from acting in reliance on any alleged fraudulent statements.

To prevail on a fraud action in Florida, one element that must be established is "consequent injury by the other party *acting in reliance* on the [false] representation."

*Wadlington*, 907 So. 2d at 632 (citing *Cohen*, 843 So. 2d at 991) (emphasis added). Defendants emphasize that Plaintiff was represented by counsel in *September* of 2012. (Doc. 149:27). However, Defendants omit that Ms. Doud's letter was originally sent in *March* of 2012. Whether Plaintiff actually suffered any injury by acting in reliance on this provision is a matter that must be determined at trial. However, by originally sending the letter in March of 2012, before Defendants' allegation that Plaintiff retained counsel in September of 2012, Defendants' argument must fail.

Plaintiff provides evidence of another mention of ERISA by Defendants in a correspondence dated December 14, 2012. (Doc. 154-3:33). Defendants raise no arguments concerning this letter and the Court will not address it at this time.

There is no reason to grant summary judgment as to Count Nine. Accordingly, Defendants' motion for summary judgment as to Count Nine is **DENIED**.

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT ONE AND DEFENDANTS' AFFIRMATIVE DEFENSES

### Count One: Breach of Contract

Plaintiff's argument in moving for summary judgment is essentially the opposite of that made by the Defendants in their Motion for Summary Judgment (Doc. 149) and discussed above. The crux of Plaintiff's position is that there is no material issue of fact as to Dr. Hepp's pre-disability occupation and his inability to perform that occupation after his disability. (Doc. 145:16). Plaintiff argues that he is undisputedly entitled to total disability benefits, and that judgment as to Count One, breach of contract, should be entered on his behalf as a matter of law. (Doc. 145).

The same issues and analysis at dispute for Defendants' motion for summary judgment discussed above apply here. Again, the Court must look at the policies separately.

**Policy 1: Paul Revere Life Insurance Company, Policy # 01025591750**

As the analysis above concluded, the term "occupation" in Policy 1 is ambiguous. Therefore, "occupation" should be construed against the insurer. *See Deni Assocs. of Fla., Inc.*, 711 So. 2d at 1140. Accordingly, "occupation" should be construed as limited to Plaintiff's specialty *if* Plaintiff can demonstrate that his practice is truly limited to electrophysiology.

Just as a reasonable jury could have determined that Plaintiff's occupation was limited to electrophysiology, a reasonable jury could determine that Plaintiff's occupation also included general cardiology. Defendants provided evidence that (1) Plaintiff was advertised as having multiple specialties by his employer (Doc. 148:10), (2) Plaintiff listed himself as performing both cardiology and electrophysiology (Doc. 148:13), and (3) Plaintiff's invasive electrophysiology practice was relatively small compared to his office practice (Doc. 148-10).

Construing the evidence in the favor of the Defendants, Plaintiff's occupation would not be limited to electrophysiology—rather, his occupation would be both electrophysiology and general cardiology. Given that Plaintiff alleges he works as a general cardiologist now, this broader "occupation" would prevent recovery of total disability under Policy 1. Construing these facts in Defendants favor, Plaintiff is not entitled to judgment as a matter of law and summary judgment is inappropriate for Policy 1.

**Policy 2: Provident Life and Accident Insurance Company, Policy #52-05103794**

Under Policy 2, Plaintiff's occupation is defined by his specialty, electrophysiology, if his occupation was limited to that practice. Again, while the parties agree that electrophysiology constitutes a recognized specialty under the Policy, the parties dispute whether Plaintiff's practice was limited to the specialty.

Plaintiff provides evidence (1) that Dr. Hepp was performing more ablations and EP studies than required for minimum competency as an electrophysiologist (Doc. 155:7), (2) that Dr. Hepp performed the appropriate range of electrophysiology procedures for his age and training (Doc. 154:9), and (3) that Plaintiff merely described himself as both an electrophysiologist and a cardiologist because electrophysiology is not well-known (Doc. 146:10-11).

Defendants provide evidence that (1) Plaintiff did not perform enough, and a wide enough variety of, invasive procedures consistent with electrophysiology (Doc. 148:10), (2) Plaintiff was advertised as having two specialties by his employer (Doc. 148:10), and (3) Plaintiff listed himself as performing both cardiology and electrophysiology (Doc. 148:13).

Construing the evidence in favor of the Defendants, Plaintiff would not be limited to his specialty of electrophysiology. As such, his occupation would be defined broader than as an electrophysiologist for Policy 2. If Plaintiff's "occupation" was defined as a cardiologist, there would be no possibility to establish total disability under Policy 2—Plaintiff argues that he now works as a cardiologist. As such, when construing the facts in favor of the Defendants, Plaintiff would not be entitled to judgment as a matter of law under Policy 2 and summary judgment would be inappropriate.

**Conclusion**

In conclusion, there are genuine issues of material fact and Plaintiff is not entitled to judgment as a matter of law under both Policy 1 and Policy 2. Accordingly, Plaintiff's motion for summary judgment as to Count One is **DENIED**.

**Defendants' Defenses**

Plaintiff requests summary judgment as to all of Defendants' 33 defenses. (Doc. 145:17). As an initial matter, Defendants concede that the Seventh Defense, Fourteenth Defense, Fifteenth Defense, Sixteenth Defense, Seventeenth Defense, Eighteenth Defense, Nineteenth Defense, and Twenty-First Defense are not applicable to this dispute. (Doc. 153:19). Accordingly, Plaintiff's motion for summary judgment is **GRANTED** with respect to the Seventh, Fourteenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth, and Twenty-First Defenses. Therefore, only the remaining 25 defenses are at dispute.

The Federal Rules of Civil Procedure permit a party to file a motion for summary judgment as to affirmative defenses without first filing a motion to strike the affirmative defenses. *Spellman v. RSC Equipment Rental, Inc.*, No. 6:08-cv-1673-Orl-18KRS, 2010 WL 450400 (M.D. Fla. Feb. 8, 2010). However, entry of summary judgment is only appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and *on which that party will bear the burden of proof at trial*." *Id.* (quoting *Celotex Corp.*, 477 U.S. at 322, 106 S. Ct. at 2552) (emphasis added).

After Plaintiff filed a Motion to Compel Documents (Doc. 73), the Court stated that "[t]o the extent that Defendants have *documents* supporting any affirmative defense, such shall be produced within twenty (20) days from the date of this Order." (Doc. 112:4) (emphasis added). Plaintiff notes that Defendants have not produced any *documents* other than the claims file with respect to the affirmative defenses. (Doc. 145:17). Summary judgment would only be appropriate to any defense (1) that the Defendants bears the burden of proving, (2) which cannot be established outside of the claims file, and (3) are not established by other types of evidence.

First, a number of Defendants' defenses were rejected by the Court in the Order on Defendants' Motion to Dismiss the Complaint. (Doc. 27). These defenses include: the Eighth Defense (Plaintiff failed to state a claim upon which relief can be granted for Counts 3, 5, 6, 7, 8, and 9), the Eleventh Defense (Plaintiff fails to allege all the elements for a cause of action for fraud and that Plaintiff did not allege fraud with specificity), and the Twelfth Defense (Complaint failed to allege false or misleading statements with specificity). Accordingly, Plaintiff's motion for summary judgment to the Eighth, Eleventh, and Twelfth Defenses is **GRANTED**.

Defendants characterize their defenses as "general" defenses as opposed to "affirmative" defenses. (Doc. 153:19). Many of these defenses essentially state that the Plaintiff cannot establish *his burden* on the claims or that the claims are barred as a matter of law. These defenses include: the First Defense (Defendants acted reasonably in accordance with the terms of the Policies), the Second Defense (Plaintiff failed to fulfill all conditions precedent), the Third Defense (Plaintiff failed to state a cause of action for residual disability benefits), the Fifth Defense (Unum Group is not in privity of contract with Plaintiff), the Sixth Defense (Plaintiff's claims are barred by the economic loss rule), the Tenth Defense (Defendants have complied with all promises under the Policy and law), the Twentieth Defense (Plaintiff ratified, adopted, authorized, and/or acquiesced to the actions and/or omissions complained of), the Twenty-Fourth Defense (Defendants did not make any material misrepresentation upon which Plaintiff reasonably relied), the Twenty-Fifth Defense (Plaintiff failed to allege and establish an enterprise), the Twenty-Sixth Defense (Plaintiff failed to establish a civil RICO conspiracy), the Twenty-Seventh Defense (Plaintiff failed to establish the predicate acts within the meaning of the RICO statute), the Twenty-Eighth Defense (Plaintiff lacks standing to assert a civil RICO

37

claim), the Twenty-Ninth Defense (Plaintiff failed to establish that Unum participated in the affairs of the alleged enterprise), the Thirtieth Defense (Plaintiff has not suffered damage within the meaning of the RICO statute), the Thirty-First Defense (Unum has not engaged in a pattern of racketeering activity), the Thirty-Second Defense (Plaintiff has failed to establish mail and/or wire fraud), and the Thirty-Third Defense (Plaintiff did not rely upon any misrepresentation and Plaintiff's reliance was not reasonable).

"An affirmative defense raises matters extraneous to plaintiff's *prima facie* case." *In re Rawson Food Service, Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988) (quoting *Ford Motor Co. v. Transport Indemnity Co.*, 795 F.2d 538, 546 (6th Cir. 1986)). A defense that only points out a defect in the plaintiff's prima facie case is not an affirmative defense. *Id.* Such a defense should be treated as a denial. *Vance v. Westfalia Technologies, Inc.*, No. 8:12-cv-1902-EAK-TGW, 2013 WL 3270414 (M.D. Fla. June 26, 2013). Defendants concede that "these defenses primarily reflect Plaintiff's inability to meet *his* burden of proof on his various causes of action." (Doc. 153:19). Accordingly, these defenses will be transferred to denials. Accordingly, Plaintiff's motion for summary judgment for the First, Second, Third, Fifth, Sixth, Tenth, Twentieth, Twenty-Fourth, Twenty-Fifth, Twenty-Seventh, Twenty-Eighth, Twenty-Ninth, Thirtieth, Thirty-First, Thirty-Second, and Thirty-Third Defenses is **DENIED**.

The Twenty-Second Defense (Relief should be precluded by virtue of Plaintiff's failure to mitigate damages) is an affirmative defense. *See Vance*, 2013 WL 3270414. Plaintiff has not met his burden and, therefore, Plaintiff's motion for summary judgment as to the Twenty-Second Defense is **DENIED**.

The remaining defenses are based upon information that is included in Plaintiff's policies—which are included in the claims file that the Defendants provided. These defenses

include: the Fourth Defense (The policies contain limitations and exclusions which are legally sufficient defenses to Plaintiff's claims), the Ninth Defense (Plaintiff's recovery is limited to the terms of the Policy), the Thirteenth Defense (Plaintiff's future recovery is limited to the terms of the policies), and the Twenty-Third Defense (Relief and causes of actions are limited to the provisions of the Policy). Accordingly, Plaintiff's motion for summary judgment for the Fourth, Ninth, Thirteenth, and Twenty-Third Defenses is **DENIED**.

**Conclusion**

Plaintiff's motion for summary judgment to Defendants' defenses is **GRANTED IN PART**, as to the Seventh, Eighth, Eleventh, Twelfth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth, and Twenty-First Defenses, and **DENIED IN PART**, as to all remaining defenses.

## CONCLUSION

For the reasons given above, Defendants' Motion for Summary Judgment (Doc. 149) is **DENIED** and Plaintiff's Motion for Summary Judgment (Doc. 145) is **GRANTED IN PART**, with respect to Defendants' Seventh, Eighth, Eleventh, Twelfth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth, and Twenty-First Defenses, and **DENIED IN PART** as to all other defenses and to Count One.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 31st day of July, 2015.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT COURT JUDGE

Copies to: All Parties and Counsel of Record